Kelly CRAIG, Plaintiff,

v.

**Mel BOUDROT, as President of the New York Branch of the Screen Actor's Guild, Inc., Defendant.**

No. 99 Civ. 1687 (LAK).

United States District Court,
S.D. New York.

March 12, 1999.

---

Arthur Z. Schwartz, Kennedy, Schwartz & Cure, P.C., New York City, for plaintiff.

Joseph R. Gagliano, Squadron, Ellenoff, Plesent & Sheinfeld, New York City, for defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

The New York branch of the Screen Actor's Guild, Inc. held an election in November 1998 for eight three-year positions on the branch board of directors. Candidates ran at large for all eight seats, with the holders of the eight highest vote totals to be the winners. The election resulted in a tie for the eighth seat between plaintiff Kelly Craig and Jonathan Derwin, an incumbent who ran for reelection. Craig brings this action to compel the New York branch ("NYSAG"), among other things, promptly to hold a run-off election between Derwin and herself as allegedly is required by the governing documents of the union. The union, which has continued Derwin in office on the theory that no successor has been qualified, resists. This is the Court's decision following a bench trial.

## Facts

The Screen Actor's Guild, Inc. ("SAG") is a labor union representing the interests of screen actors.[1] It is a national labor organization within the meaning of the Labor–Management Reporting and Disclosure Act,[2] better known as the Landrum–Griffin Act (the "Act").

SAG is governed by a Constitution and By–Laws. NYSAG operates pursuant to Rules of Procedure adopted by the SAG board which, pursuant to Article XVI of the SAG Constitution, have "the force of By–Laws" and bind NYSAG and its members.

On June 29, 1998, NYSAG's director nominating committee proposed a slate of eight members, including Derwin, to stand for election to the eight three-year positions on the NYSAG board at the 1998 election. Plaintiff Kelly Craig and seven other members formed an insurgent slate to contest those positions. Balloting was conducted by mail from October 15 through November 5, 1998. Ballots were counted by the Honest Ballot Association ("HBA"), which had been retained for that purpose by NYSAG.

On November 23, 1998, NYSAG announced the election of seven members (six members of the nominating committee slate and one insurgent) and a tie between Craig and Derwin. It announced also that Craig and Derwin would compete in a run-off election pursuant to SAG's Constitution and By–Laws, but that Derwin would continue to serve until the run-off was determined. Despite the promise of a run-off, however, no new election has occurred.

Immediately following the announcement of the election results, Craig filed a complaint with NYSAG concerning a number of matters relating to the election as well as the continuation of Derwin in office.[3] All were rejected by NYSAG's election committee on December 18, 1998.[4]

On December 24, 1998, Craig wrote to NYSAG's executive director, John Sucke, and threatened to sue unless NYSAG held a prompt run-off election in accordance with its Rules of Procedure. She demanded also that the election be conducted by the American Arbitration Association rather than the HBA, which she accused of having made "a shambles" of the November poll. A few days later, NYSAG acknowledged that a run-off was required "as soon as practicable," but declined to schedule a vote prior to January 25, 1999 on the theory that doing so would conflict with a referendum on whether to merge SAG with the American Federation of Television & Radio Artists, which was scheduled for that date and in fact occurred.

Craig responded by threatening to sue if the run-off did not commence by January 11, NYSAG responded on January 6, 1999 with an announcement that ballots for the run-off would be mailed on February 10, 1999. But even that did not occur.

On January 19, 1999, Craig and a number of other unsuccessful candidates filed three different complaints with the United States Department of Labor ("DOL") concerning the November election. DOL promptly became involved and disclosed on January 28, 1999 that it would recount the November ballots. It advised Craig that it would act quickly so as not to interfere with the pending run-off election in the event the recount confirmed the Derwin–Craig tie.

The DOL investigator completed his recount on February 4, 1999 and confirmed that the November election had resulted in a tie between Derwin and Craig. According to Sucke, however, the investigator

---

**1.** It is a labor union within the meaning of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. §§ 141–87 (the "LMRA").

**2.** 29 U.S.C. § 401 *et seq.*

**3.** DX B.

**4.** DX C.

advised also that the final decision would be made by DOL in Washington.

Following the receipt of this information, Sucke, allegedly without any input from NYSAG's board or officers, decided to delay the run-off indefinitely pending DOL's decision. He asserts that he did so because the run-off would cost the union $30,000 for printing, postage and ballot counting, an expense that could prove unnecessary if DOL were to determine—contrary to the findings of both the HBA and its own investigator—that one of the two candidates tied for the eighth board seat actually had more valid votes than the other.

### Prior Proceedings

Craig commenced this action on February 5, 1999 in the Supreme Court of the State of New York, County of New York, and immediately moved by order to show cause for a preliminary injunction requiring, *inter alia*, that NYSAG conduct the run-off election. For reasons that remain obscure, the justice presiding made the order to show cause returnable more than a month later, on March 8, 1999, despite the fact that plaintiff could have brought the motion on in only eight days had she proceeded by notice of motion.[5]

NYSAG was quick to exploit the opening thus created. It did nothing for an extended period. Then, with the state court preliminary injunction hearing set for the next business day, it removed the case to this Court on Friday, March 5, 1999—and served no papers in opposition to the motion. At a conference before this Court on March 8, 1999, counsel for NYSAG admitted that nothing had occurred with respect to the removability of the case between its commencement on February 5 and its removal on March 5 and sought a postpone-

ment for the purpose of preparing papers in opposition to plaintiff's motion.

In view of the fact that the union's counsel already had had nearly a full month in which to prepare papers, the Court granted it an additional two days and set the preliminary injunction hearing for March 11. On that date, with the consent of the parties, the Court consolidated the trial on the merits with the hearing on the preliminary injunction motion.[6] The case was tried on a record consisting of the papers in support of and in opposition to the motion, stipulations made by counsel, and the live testimony of John Sucke.

### Discussion

Craig initially made two claims in this case.[7] First, she contended that NYSAG's failure to hold the run-off election is intended to favor Derwin, the incumbent whom it has continued in office based on the failure to elect a successor, and in any case violates NYSAG's own Rules of Procedure. Second, she asserted that the Rules of Procedure require that ballots in the run-off be counted by a certified public accountant and therefore exclude the HBA. At trial Craig added an additional contention, viz. that the continuation of Derwin on the NYSAG board following the November election is unlawful in the circumstances of this case.

### The Run–Off Election Claim

Article VI of the SAG Constitution and By–Laws creates a number of branches, including NYSAG, in local geographic areas. The members of the board of directors elected by NYSAG are to "govern the local affairs of the New York Branch under such rules and regulations as shall from time to time be prescribed by the

---

5. N.Y. CPLR 2214(b) (McKinney 1991).

6. *See* FED.R.CIV.P. 65(a)(2).

7. The parties agree that this Court has jurisdiction pursuant to Section 301 of the LMRA, 29 U.S.C. § 185. *See Shea v. McCarthy,* 953 F.2d 29, 31 (2d Cir.1992) (union members may sue under § 301 for violations of the union constitution).

Board of Directors." [8] The NYSAG Rules of Procedure in turn provide for elections of directors of NYSAG and state in relevant part that any tie in the vote for election to the board shall be resolved by "a run-off election ... held as soon as practicable ... between the persons tied ..." [9]

Craig contends that NYSAG's refusal to proceed with the run-off contravenes that provision of the Rules of Procedure. NYSAG, on the other hand, contends that Craig's exclusive remedy is action by the DOL under Section 402 of the Act [10] and, in any case, that the Court is obliged to defer to its allegedly reasonable construction of its own Rules.

■ NYSAG's jurisdictional or quasi-jurisdictional objection is without merit. Section 402 of the Act creates a mechanism whereby a union member who has exhausted his or her remedies within the union may file a complaint with the DOL concerning, among other things, alleged constitution and by-law violations pertaining to the election of officers. [11] Moreover, Congress made the Section 402 remedy exclusive with respect to elections already conducted. [12] But Section 403 expressly provides that "[e]xisting rights and remedies to enforce the constitution and bylaws of a labor organization *with respect to elections prior to the conduct thereof shall not be affected by the provisions of this subchapter.*" [13] In consequence, union members are not precluded from seeking judicial relief with respect to alleged constitutional and by-law violations with respect to future elections. [14]

NYSAG counters with the contention that the run-off would be a continuation of the November election for purposes of Section 402 rather than a pre-election matter over which a district court properly may exercise jurisdiction under Section 403. While its premise is correct in the sense that the run-off will complete the result that the November election was intended to produce, its conclusion is not. Acceptance of NYSAG's argument in the context of a run-off election would lead to nonsensical results by curtailing statutory rights in the period leading up to the run-off. [15]

■ NYSAG next argues that the conduct of a run-off before completion of the DOL investigation would involve expense that could prove unnecessary if the tie were broken on yet another recount or the November election voided entirely. It therefore contends that it reasonably concluded that a run-off following completion of the DOL investigation would be "as soon as practicable" within the meaning of the Rules and that the Court is obliged to defer to its judgment. But the argument is unpersuasive in the context of this case.

First, when Congress considered the legislation that became the Landrum–Griffin Act, it was concerned with providing fair election procedures and, to that end, provided in Section 402 for the DOL com-

8. SAG Const., Art. VI, § 5.

9. NYSAG Rules of Procedure Art. IV, § 5.

10. 29 U.S.C. § 482.

11. DOL may investigate and, if it finds probable cause to believe that there has been a violation of the Act, bring an action in the appropriate district court for relief, which may include a new election. *Id.*

12. *Id.* § 483.

13. *Id.* (emphasis added). *Libutti v. DiBrizzi,* 343 F.2d 460, 461 (2d Cir.1965).

14. *See, e.g., Commer v. District Council 37, Local 375,* 990 F.Supp. 311, 319 (S.D.N.Y. 1998); *see generally Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen & Packers v. Crowley,* 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984).

15. For example, the right of candidates under Section 401(c), 29 U.S.C. § 481(c), to inspect a list of union members "once within 30 days prior to an election" would be vitiated or undermined with respect to a run-off if the run-off were regarded as part of the initial election.

plaint procedure upon which NYSAG relies. But it was equally concerned with the possibility that DOL consideration of member complaints would create uncertainty as to union governance during the pendency of those matters. The Senate report on the legislation made this point clear:

> "One final point is significant. Since union business must not be brought to a standstill whenever an election is challenged, it is necessary to make some provision for the conduct of business while the proceeding is in progress." [16]

The Congress therefore included specific language in Section 402 which deals directly with this situation:

> "The challenged election shall be presumed valid pending a final decision thereon (as hereinafter provided) and in the interim the affairs of the organization shall be conducted by the officers elected or in such other manner as the constitution and bylaws may provide." [17]

Thus, NYSAG is obliged to presume that the November election was valid and resulted in a tie and to conduct itself accordingly.

By refusing to hold a run-off election as long as the DOL inquiry remains open—in the face of a provision in its Rules requiring such an election "as soon as practicable"—against the possibility that the inquiry will resolve the tie or require a new election, NYSAG is doing precisely what Congress proscribed. It is using the pendency of a challenge to avoid filling the vacancy on its board by election. This it may not do, at least absent a constitutional or by-law provision specifically so providing, any more than a disappointed candidate may use the pendency of a DOL investigation of a challenge to the certified election of a director to prevent that director from serving until the investigation ends.

Second, NYSAG's interpretation of the Rules is at variance with the plain meaning of the words and its own prior actions. "Practicable" means "capable of being put into practice, done or accomplished." [18] "As soon as practicable" therefore means at the earliest time the object is capable of being achieved. A run-off election is no less capable of being conducted now than it was in February when NYSAG originally scheduled it. The possibility that subsequent developments eventually might invalidate the run-off does not bear on when a run-off could be conducted. Indeed, NYSAG recognized as much when it initially scheduled the run-off for February despite the fact that its election committee had rejected complaints concerning the November election, a circumstance making further complaints to DOL entirely foreseeable.

Finally, the Court finds it is more probable than not that NYSAG has not acted in good faith in refusing to conduct the run-off. It has used the continuing failure to elect an eighth director to justify the continuation in office of Derwin, one of the members of the nominating committee slate who failed to win election. Its litigation tactic of seeking to defer consideration of the already long delayed preliminary injunction motion by failing to submit opposing papers, removing the case to this Court, and then seeking a postponement evidence an intention to delay. [19] Indeed, it is reminiscent of conduct that led the Second Circuit to find bad faith and impose sanctions on the New York City Board of

---

**16.** S.Rep. No. 187, 86th Cong., 1st Sess. (1959), *reprinted in* 2 U.S.C.C.A.N. 2318, 2338 (1959).

**17.** 29 U.S.C. § 482.

**18.** Webster's Third New Int'l Dictionary of the English Language Unabridged 1780 (1963).

**19.** There is no basis for blaming NYSAG for the long delay between the making of the preliminary injunction motion and the return date set by the state court.

Elections in another election dispute.[20] And the claim that the reason for the delay is to avoid, if possible, the $30,000 expense of the run-off is not credible in view of the union's willingness to engage a prominent law firm to litigate this case, a significant expense and one almost certain to exceed the projected cost of the run-of in the event the matter is appealed.[21]

The union nevertheless protests that its good faith is established by its professed willingness to abide by the result of the DOL's inquiry, which supposedly will be forthcoming no later than April 9.[22] But the argument at best overlooks the nature and likely duration of that process.

The DOL's task at this stage is to determine whether there is probable cause to believe there has been an unremedied violation of the Act. If it so concludes, it may sue in district court to set aside an invalid election or obtain other appropriate relief, which presumably could include the installation of either Derwin or Craig as the eighth director based on another recount.[23] But even acquiescence by NYSAG in any relief sought by the DOL would not end this controversy. Candidates in a questioned election and even union members perhaps may intervene as a matter of right and in any case may seek leave to intervene.[24] Hence, there is no reason to suppose that acquiescence by NYSAG in whatever view the DOL reaches (perhaps apart from yet another confirmation of the tie and the need for a run-off) will end the controversy, as NYSAG well knows. To the contrary, there is every reason to believe that April 9 will be only another milestone along rather than the end of the highway.

This Court is mindful of the deference due unions' interpretations of their own organic documents and of the need for caution in determining whether to become involved in union elections. But deference and caution are not synonymous with blindness and paralysis. In *Sim v. New York Mailers' Union No. 6*,[25] the Second Circuit, although holding that great deference ordinarily is given to unions' interpretations of their own constitutions, noted that "courts will ignore interpretations made by union officials which run adverse to the plain meaning of contract language."[26] The circuit there drew its standard from *Spellacy v. Airline Pilots Ass'n*.[27] a case involving construction of a collective bargaining agreement, where it indicated that a union's good faith and the absence of "motivations such as personal animosity or political favoritism" also are relevant in determining the deference to be accorded to its interpretation.[28] Moreover, the propriety of judicial vigilance lest deference be transformed into protection for union "self protectionism" and bad faith is well established.[29]

**20.** *Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 40 (2d Cir.1993).

**21.** The projected cost of the run-off would about 0.5 percent of the union's budget. Tr. 93.

**22.** The DOL is obliged to make a determination by that date absent an agreement extension of time. However, it reportedly has made clear its intention to file suit by then "as a place holder" if it needs additional time. Tr. 78–79.

**23.** 29 U.S.C. § 482(b).

**24.** *See, e.g.*, Fed.R.Civ.P. 24; *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 536–37 & n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972) (Act does not prohibit intervention by union members on claims presented by DOL; intervention as of right warranted where there is doubt as to adequacy of representation of putative intervenor's interest); *Marshall v. Local 299, Int'l Bhd. of Teamsters*, 617 F.2d 154, 156 (6th Cir.1980) (reversing order denying motion by unsuccessful candidate to intervene as of right).

**25.** 166 F.3d 465 (2d Cir.1999).

**26.** *Id.*

**27.** 156 F.3d 120 (2d Cir.1998).

**28.** *Id.* at 127

**29.** *See Allen v. United Transp. Union*, 964 F.2d 818, 821 (8th Cir.1992) (bad faith); *Motion Picture & Videotape Editors Guild, Local 776*,

In this case, NYSAG's position flies in the face of, or at least is in substantial tension with, the plain language of the Rules. Its actions favor the retention in office of an incumbent nominated by the board-appointed nominating committee who failed to win reelection. Its litigation tactics evidence a desire to delay the run-off. Its explanation for the desirability of the delay, potential cost savings, is undermined both by its willingness to spend a comparable amount of union funds litigating in an effort to forestall the run-off election and by the comparatively small size of the expense involved. In consequence, the Court is not obliged to give substantial deference to NYSAG's professed determination of practicability. NYSAG's failure to hold a run-off election to elect an eighth director to a three-year term violated, and continues to violate, its own Rules of Procedure.

■ NYSAG's protestations notwithstanding, Craig and other union members plainly are threatened with immediate and irreparable injury by NYSAG's refusal to conduct the run-off election. Section 411(a)(1) of the Landrum–Griffin Act[30] protects the right of union members to nominate candidates and to vote in union elections, subject to reasonable rules and regulations in the union's constitution and by-laws. By declining to hold the run-off election, NYSAG is depriving its members of the right to vote for candidates to fill the eighth three-year position on the board of directors and thus of the right to have that seat filled by a duly elected director. Deprivations of voting rights long have been regarded as irreparable because they obviously cannot be remedied by an award of damages.[31] In consequence, Craig is entitled to an injunction requiring the prompt conduct of a run-off election. The Court will fix the time for mailing ballots, which in any event cannot be immediate in view of the need for printing and a reasonable time for campaigning, for after April 9 in order to take advantage of the possibility, however remote, that the DOL inquiry precipitates a final resolution of the controversy concerning the November election by that date.

### The Ballot Counter Claim

■ Craig's claim regarding the choice of a person or organization to count the ballots is another matter. While there is some evidence of ground for dissatisfaction with the HBA in the past, the possibility that it will fail to perform properly in a future run-off election is purely speculative. Moreover, there has been no showing that Craig and other NYSAG members would lack effective remedies in the event of any colorable claims of irregularity. Plaintiff thus has failed to demonstrate the necessary threat of irreparable injury[32] with respect to her request for an order requiring NYSAG to engage a certified public accountant to conduct any run-off election. In consequence, there is no need to address the merits of Craig's contention.

### The Continuation of Derwin Pending the Election

■ As indicated above, Craig belatedly asserted at trial that Derwin should be removed from the NYSAG board pending the results of the run-off. While the con-

800 F.2d 973, 975, *amended,* 806 F.2d 1410 (9th Cir.1986), *cert. denied,* 483 U.S. 1022, 107 S.Ct. 3267, 97 L.Ed.2d 765 (1987) (same); *Mason Tenders Local Union 59 v. Laborers' Int'l Union of N. Am.,* 924 F.Supp. 528, 543–44 (S.D.N.Y.), *aff'd mem.,* 101 F.3d 686 (2d Cir.1996); *United States v. Int'l Bhd. of Teamsters,* 743 F.Supp. 155, 164 (S.D.N.Y.), *aff'd,* 905 F.2d 610 (2d Cir.), *cert. denied,* 496 U.S. 925, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1990) ("self protectionism").

**30.** 29 U.S.C. § 411(a)(1).

**31.** *E.g., Mason Tenders Local Union No. 59,* 924 F.Supp. at 542–43; *see, e.g., Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

**32.** *E.g., City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

tention raises an interesting question, the Court concludes that it is not appropriately decided in this context.

The dispute arises in consequence of Section 5220(b) of the California Corporations Code, which provides in relevant part:

> "Unless the articles or by-laws otherwise provide, each director, including a director elected to fill a vacancy, shall hold office until the expiration of the term for which elected and until a successor has been elected and qualified." [33]

Here, the terms of eight directors expired, all of them having been elected at large. An at-large election was held to choose their successors. As a result of the tie vote for the eighth seat, however, only seven successors were elected.

The fact that the November election was at large—that is, no one ran for any specific seat on the board—means that it is impossible to say whether or not one of the seven directors who were elected was Derwin's "successor." Moreover, four of the directors who previously filled these eight seats were not reelected, some not even having stood for reelection. Craig therefore argues that it is impossible to say either that (1) one of the seven who was elected in November was not elected as Derwin's "successor," in which case it would be inappropriate for Derwin to continue in office on the theory that his successor has not be elected and qualified, or (2) the eighth seat is not that of one of the other three persons who was a director prior to the November election, in which case that individual should continue in office rather than Derwin. She contends that Sucke's determination that Derwin would continue was wrong as a matter of California law, beyond his authority, and evidence of favoritism toward her opponent.

Whatever the merits of Craig's argument, Derwin is vitally interested in its outcome. Moreover, in view of the charges of partiality toward Derwin leveled against NYSAG, it is far from clear that NYSAG may be depended upon to protect his interests in the present posture of this lawsuit, whatever its disposition may have been before. Hence, Derwin is a person who should have been joined under Rule 19(a).

Resolution of Craig's claim in Derwin's absence could be prejudicial to him. Given the nature of the claim, that prejudice cannot be avoided by protective provisions in the judgment or by shaping the form of relief. Inasmuch as the Court has concluded that a prompt run-off election is appropriate, the issue likely will become moot in a relatively short time. Accordingly, the Court concludes that dismissal of this claim without prejudice for non-joinder of Derwin, a course that would leave plaintiff free to raise the issue in a proper manner, is the appropriate course.

### Conclusion

For the foregoing reasons, Craig is entitled to an injunction requiring a run-off election. Her remaining claims are dismissed, the claim that Derwin should be removed from the NYSAG board pending the results of a run-off election being dismissed without prejudice for non-joinder. Accordingly, it is hereby

ORDERED, that NYSAG shall conduct a run-off election between plaintiff Craig and Jonathan Derwin for a three-year term on its board of directors, and it is further

ORDERED, that ballots shall be mailed to NYSAG members no later than April 12, 1999, that ballots returned on or before May 3, 1999 shall be counted, and that the results of the run-off election shall be certified no later than May 10, 1999.

---

**33.** CALIF.CORP.CODE § 5220(b) (West 1998).