James J. MCDERMOTT, Regional Director of Region 31 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

and

Dura Art Stone, Inc., Respondent Employer,

and

Amalgamated Industrial Workers Union, Local 61, Respondent Union.

No. EDCV03752RT(SGLX).

United States District Court, C.D. California.

Aug. 13, 2003.

Byron B. Kohn, Margaret Hume, Brian D. Gee, Los Angeles, CA, for Petitioner.

Robert F. Millman, Gordon A. Letter, Littler Mendelson, Los Angeles, CA, for Respondent–Employer.

Howard Z. Rosen, Posner & Rosen, Los Angeles, CA, for Respondent Union.

1) ORDER GRANTING PETITIONER'S APPLICATION FOR TEMPORARY INJUNCTION UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT AND 2) TEMPORARY INJUNCTION

TIMLIN, District Judge.

The court, Judge Robert J. Timlin, has read and considered petitioner James J.

McDermott ("Petitioner"), Regional Director of Region 31 of the National Labor Relations Board ("Board")'s application for a temporary injunction under Section 10(j) of the National Labor Relations Act ("Act"), 29 U.S.C. § 151 *et seq.* ("Section 10(j)"), respondent employer Dura Art Stone, Inc. ("Dura Art Stone") and respondent union Amalgamated Industrial Workers Union, Local 61 ("AIWU Local 61") (collectively, "Respondents")' oppositions, and Petitioner's reply. Additionally, the court has read and considered the *amicus curiae* brief filed by the United Electrical, Radio and Machine Workers of America ("UE"), and Respondents' oppositions thereto.[1] Based on such consideration, the court concludes as follows:

**I.**

**BACKGROUND** [2]

On June 5, 1990, AIWU Local 61 was certified by the Board as the exclusive collective-bargaining representative of Dura Art Stone employees at its facility in Fontana, California, in the following bargaining unit: finishing employees, welders, forklift operators, drivers, and housekeeping and janitorial employees.[3]

For the next twelve years, AIWU Local 61 and Dura Art Stone were parties to four consecutive three-year collective-bargaining agreements ("CBA"). The 1999–2002 CBA expired on October 21, 2002.

Prior to September 19, 2002, AIWU Local 61 and Dura Art Stone met to negotiate a new CBA. On September 20, 2002, Dura Art Stone received an employee disaffection petition signed by a majority of the employees in the bargaining unit. On

---

1. The court granted UE's motion to appear as *amicus curiae* on July 28, 2003.

2. The following background consists of facts uncontroverted by the parties.

3. At oral argument, counsel for Petitioner informed the court that mold makers are not part of the bargaining unit.

September 30, Dura Art Stone informed AIWU Local 61 that it had received the disaffection petition.

On October 17, 2002, Dura Art Stone and AIWU Local 61 executed a CBA for 2002–2005. At no time prior to or during the window period (July 21, 2002 to August 20, 2002) or prior to the insulated period (August 21, 2002 to October 21, 2002) was any type of petition for representation (e.g., an RM, RC, or RD petition) filed with the Board.[4]

On October 25, 2002, the UE delivered a demand for recognition to Dura Art Stone.

On November 4, 2002, UE filed unfair labor practice charges against AIWU Local 61 and Dura Art Stone. Based on such charges, Petitioner issued a Consolidated Complaint. The hearing on the Consolidated Complaint took place on May 19, 2003.

On July 2, 2003, Petitioner filed the instant application for a temporary injunction under Section 10(j) of the Act.

## II.

### ANALYSIS

**Section 10(j)**

■ Section 10(j) authorizes the Board to seek a temporary injunction pending the final determination by the Board regarding the unfair labor practices complaint before it. *Miller v. California Pacific Medical Center,* 19 F.3d 449 (9th Cir.1994) (en banc). In determining whether a temporary injunction should issue, a court must consider: (1) the likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to the moving party if relief is not granted; (3) the extent to which the balance of hardships favors the respective parties, and (4) in certain cases, whether the public interest will be advanced by granting the preliminary relief. *Id.* at 456.

### 1. Likelihood of Success

■ Petitioner contends that Dura Art Stone and AIWU Local 61 violated Sections 8(a)(1), (2), and (3), as well as 8(b)(1)(A) and (b)(2) of the Act, when they negotiated and entered into a new CBA during the insulated period despite knowledge of an employee disaffection petition signed by a majority of the bargaining unit employees indicating that AIWU Local 61 no longer enjoyed majority support of the members of the bargaining unit.[5] Respondents admit that they were aware of the petition during negotiations of the new

---

4. There are three types of representation petitions: RC, RM, and RD. In an RC petition, which is generally filed by a union, the filing party seeks to be designated as the bargaining representative of the employees in the bargaining unit. In an RM petition, which may be filed only by an employer, the filing party alleges that it has received one or more claims for recognition as the exclusive bargaining agent of the employees in the bargaining unit. In an RD petition, which is generally filed by employees, the filing party asserts that the certified or currently recognized bargaining agent is no longer the Section 9(a) representative of the bargaining-unit employees.

5. Section 8(a)(1) of the Act prohibits employers from interfering with, restraining, or coercing employees in the exercise of their rights guaranteed in Section 7 of the Act.

Section 7 provides, *inter alia,* that employees shall have the right to bargain collectively through representatives of their own choosing.

Section 8(a)(2) makes it an unfair labor practice for an employer to contribute financial or other support to any labor organization.

Section 8(a)(3) makes it an unfair labor practice for an employer to, by discrimination in regard to hire or tenure of employment or any term or condition of employment, encour-

CBA, and that the petition was signed by a majority of the bargaining unit employees. Nevertheless, Respondents contend that they were entitled to continue negotiating and enter into the CBA because "[b]ased upon *Levitz Furniture Company of the Pacific, Inc.*, 333 NLRB No. 105 (2001), an [employee] disaffection petition submitted during the insulated period does not constitute lack of majority status."

The court concludes that Petitioner has demonstrated a strong likelihood of success on the merits. The insulated period is a "60 day ... period immediately preceding and including the expiration date of an existing [CBA] ... during which the parties may negotiate and execute a new and amended [CBA] without the intrusion of a rival petition." *Deluxe Metal Furniture Co.*, 121 NLRB 995, 1000–01 (1958). However, the creation of such a period was never intended "to foreclose employees from then discharging that union as their future representative and instead to shackle them for a further 3–year term with a representative that they do not want. Such indiscriminate application of *Deluxe Metal* would do violence to the rights guaranteed employees by Section 7 of the Act." *Hart Motor Express, Inc.*, 164 NLRB 382, 384 (1967).

In the instant case, Respondents were presented with an employee disaffection petition signed by 48 out of approximately 62 bargaining unit employees on September 20, 2002, more than one month before the existing CBA was to expire. Such petition constituted objective evidence that a majority of the unit employees no longer supported AIWU Local 61. *S.M.S. Auto-motive Products, Inc. v. Lugo*, 282 NLRB 36, 43–44, 1986 WL 54217 (1986) (employee disaffection petition submitted less than sixty days before CBA was to expire constituted valid evidence that incumbent union lost its status as majority representative of the affected unit employees).

■ Even if, as Respondents contend, they "could not possibly know the circumstances under which the signatures were obtained ... [or] if the signatures truly represented the desires of the employees who signed the disaffection petition," once they became aware of the petition, Respondents should have suspended bargaining. As Trial Examiner Sherman stated in *Kenrich Petrochemicals, Inc.*, 149 NLRB at 919 n. 10, "while it is well settled that an employer may not during the term of a contract plead the incumbent union's loss of majority status as a reason for refusing to bargain with it with respect to grievances arising under the contract or changes in working conditions to take effect during the term of the contract ... I am aware of no case holding that an employer is required during the term of a contract, to bargain with an incumbent union, which has lost its majority status, concerning the terms of a new contract to take effect *after* the current contract has expired [emphasis added]."

A careful reading of *Levitz, supra*, leads this court to conclude that Respondents' reliance on it is misplaced. Contrary to Respondents' contention, *Levitz* does not stand for the proposition that "a union's majority status may only be tested by the filing of a petition during the window period" (the thirty day period before the insu-

age or discourage membership in any labor organization.

Section 8(b)(1)(A) prohibits labor organizations from restraining or coercing employees in the exercise of their rights guaranteed in Section 7.

Section 8(b)(2) makes it an unfair labor practice for a labor organization to cause or attempt to cause an employer to discriminate against an employee in violation of Section 8(a)(3).

lated period). *Levitz* dealt with the issue of whether, and under what circumstances, an employer may unilaterally withdraw recognition from an incumbent union. In that case, respondent employer and the union were parties to a CBA that was effective from February 1, 1992, to and including January 31, 1995. On about December 1, 1994, the employer received a petition bearing the signatures of a majority of the bargaining unit employees, stating that they no longer desired to be represented by the union for purposes of collective bargaining. The employer announced that it intended to withdraw recognition from the incumbent union upon the expiration of the CBA, but continued to honor the terms of the CBA until it expired. When the agreement expired, the employer withdrew recognition from the union as the collective-bargaining representative of the unit employees. After withdrawing recognition, the employer refused to bargain with the union as the representative of the unit employees.

The Board held that an employer may unilaterally withdraw recognition from an incumbent union only where the union has actually lost the support of the majority of the bargaining unit employees. The Board explained that although the employer could not lawfully have withdrawn recognition from the incumbent union effective immediately on receipt of the employee disaffection petition, because the CBA did not expire until approximately 60 days later and such petition did not prove that the incumbent union had *actually* lost the support of the majority of the bargaining unit employees, the employer's announcement that it would withdraw recognition when the CBA expired, and that in the meantime it would continue to apply

the terms of the CBA, did not violate Section 8(a)(5) and (1) of the Act.

Dura Art Stone contends that the bargaining unit employees' decision to present an employee disaffection petition during the insulated period, instead of filing a discharge petition during the window period, posed in counsel's words, a "Hobson's choice": either unilaterally withdraw recognition from AIWU Local 61, which might actually enjoy majority support, or continue to negotiate the new CBA with AIWU Local 61, which may no longer enjoy majority support. However, in *Levitz,* the Board endorsed a third way: continue to honor the terms of the CBA until it expires, and upon its expiration either a) withdraw recognition, or b) file an RM petition.[6] Such a course would have been consistent with Board precedent, including *Levitz.* It would have protected the employees' Section 7 right to select their collective-bargaining representative, and would have insulated Dura Art Stone from any unfair labor practice liability arising out of a decision to unilaterally withdraw recognition from AIWU Local 61 during the period of the existing CBA.

Because Respondents entered into a new CBA five days before the expiration of the existing CBA despite knowledge of the employee disaffection petition, and because the Board's holding in *Levitz* did not entitle Respondents to enter into the new CBA in the face of such petition, the court concludes that Petitioner has demonstrated a likelihood of success with respect to its claims that Dura Art Stone unlawfully assisted AIWU Local 61 in violation of Section 8(a)(1) and (2), and that AIWU Local 61 unlawfully restrained and coerced employees in the exercise of the rights guaranteed in Section 7 of the Act in viola-

---

**6.** Dura Art Stone correctly asserts that it was precluded from filing an RM petition during the insulated period. However, as discussed above, Dura Art Stone could have filed an RM petition immediately after the insulated period.

tion of Section 8(b)(1)(A). Further, because the new CBA contains union security and dues check-off clauses, Petitioner has demonstrated a likelihood of success with respect to its claims under Sections 8(a)(1) and (3), as well as Section 8(b)(2).

### 2. Irreparable Harm

In addition to likelihood of success on the merits, Petitioner must show that a temporary injunction is necessary to avoid irreparable harm. Petitioner contends it will suffer irreparable harm in the absence of a temporary injunction because: 1) Respondents' conduct has violated the fundamental right of employees under Section 7 to freely select their bargaining representative, and 2) giving effect to the new CBA will improperly entrench AIWU Local 61, confer upon it "unwarranted prestige," and irreparably erode support by unit employees for the rival union, UE.

Respondents contend that because AIWU Local 61 has been the certified collective-bargaining representative of the bargaining unit employees for the last twelve years, it is, in effect, already entrenched, and any concerns about further entrenchment are unjustified. Respondents further contend that the court cannot presume irreparable injury, because Petitioners have "only a fair chance of success" on the merits.

■ As discussed above, Petitioner has demonstrated a reasonable likelihood of success on the merits. Therefore, the court will presume irreparable injury. *Miller v. California Pacific Medical Center*, 19 F.3d 449, 461 (9th Cir.1994) ("[i]f the Board demonstrates that it is likely to prevail on the merits, we presume irreparable injury."); *see also United States v. Nutri–cology, Inc.*, 982 F.2d 394, 398 (9th Cir.1992).

### 3. Balance of Hardships

■ Petitioner contends that the balance of hardships tips in its favor for two principal reasons. First, in the absence of a temporary injunction, the UE would be harmed because its support among the employees would erode over time, making any Board order insufficient to restore the *status quo ante*. Second, the employees would be denied the ability to choose their collective-bargaining representative in a Board election.

Respondents contend that AIWU Local 61 would suffer serious hardship if an injunction is issued which precludes Dura Art Stone from recognizing AIWU Local 61 and enforcing the 2002–2005 CBA because: 1) AIWU Local 61 would appear on the ballot in a Board conducted election "not as a vibrant union, but as an incumbent emasculated by the negation of its [CBA];" 2) the relief sought risks imposing the burden of multiple collective bargaining on Dura Art Stone; and 3) if the court issues an injunction, and AIWU Local 61 later prevails in the underlying case before the Board, "[AIWU Local 61] will then have to regain the support of the employees which will have been completely eroded by the unlawful representation by the UE and the passage of time."

■ When considering the balance of hardships, the court must take into account the probability that declining to issue the injunction will permit the allegedly unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority. *Miller* at 460. Where the Petitioner and the Respondents each make a showing of hardship, the court must exercise its sound discretion to determine whether the balance tips in Petitioner's favor. *Id.*

The court, in the exercise of its discretion, concludes that the balance of hardships tips in favor of the Petitioner. First,

irrespective of this court's decision, erosion of support for one of the unions is largely unavoidable. If the court issues a temporary injunction, it is likely that employee support for AIWU Local 61 will erode. Likewise, if the court does not issue a temporary injunction, it is likely that support for UE will erode. Consequently, the respective hardships with respect to erosion of support are roughly equivalent. Further, while it is possible that Dura Art Stone would be required to negotiate a new CBA with UE after a Board election, such hardship is far outweighed by the hardship faced by the employees as the result of the likely violation of their fundamental right under Section 7 to choose their collective-bargaining representative. In light of that fundamental right, and because failure to issue an injunction would allow the unfair labor practice to come to fruition in the form of enforcement of the 2002–2005 CBA, Petitioner demonstrated that the balance of hardships tips in its favor.[7]

### 4. Public Interest

■ Petitioner contends that the issuance of an injunction will serve the public interest and further the purposes of the Act by preventing "the improper entrenchment of a minority union in [the] unit and thus irreparably interfere with employees' fundamental Section 7 right to bargain collectively through representatives of their own choosing."

Respondents contend that "[t]he public interest is not served by undermining the stable collective-bargaining relationship between [AIWU Local 61] and [Dura Art Stone] based upon the disaffection petition which has dubious legal significance in light of *Levitz*."

As discussed above, Petitioner has demonstrated a likelihood of success on the merits. "[U]ndermining the stable collective-bargaining relationship between [AIWU Local 61] and [Dura Art Stone]" is necessary to effect the greater public interest of protecting the right of employees to choose their collective-bargaining representative. Additionally, allowing AIWU Local 61 to continue to represent the unit "would erode the [u]nit employees' confidence in the efficacy of the collective bargaining system," *Dunbar v. Onyx Precision Services, Inc.*, 129 F.Supp.2d 230, 239 (W.D.N.Y.2000). Therefore, the court concludes that the public interest will be well-served by the issuance of an injunction.[8]

### III.

### *DISPOSITION*

ACCORDINGLY, IT IS ORDERED THAT: Petitioner's application for a temporary injunction under Section 10(j) of the National Labor Relations Act is GRANTED.

IT IS FURTHER ORDERED that Dura Art Stone, Inc., its officers, agents,

---

7. Respondents' contention that Petitioner "comes with unclean hands seeking temporary relief to overcome delay in the [Board] proceedings" because it did not agree to transfer the underlying case directly to the Board in Washington, D.C. "to expedite the agency determination," is unavailing. Due to the availability of temporary injunctive relief under Section 10(j), Petitioner was not obligated to agree to such a transfer, and its failure to so agree does not impact the balance of hardships.

8. The injunction issued will not contain a requirement that the Board impound the ballots pending a final determination by the Board of the underlying case. Because Petitioner has demonstrated a strong likelihood of success on the merits, impounding the ballots will further frustrate the objectives of the Act by unnecessarily prolonging the time to effectuate the employees' choice of their collective-bargaining representative.

successors, assigns and all persons acting in concert or participation with it:

(1) cease recognizing Amalgamated Industrial Workers Union, Local 61 ("AIWU Local 61") as the exclusive collective-bargaining representative of its finishing employees, welders, forklift operators, drivers, and housekeeping and janitorial employees employed at its plant in Fontana, California, unless and until AIWU Local 61 is certified by the National Labor Relations Board as the exclusive collective-bargaining representative of such employees;

(2) cease giving effect to its collective-bargaining agreement with AIWU Local 61, executed on October 17, 2002, or any renewal, extension, or modification thereof provided, however, that nothing in this Order shall require Dura Art Stone, Inc. to vary or abandon any existing wages or benefits established for employees by the current collective bargaining agreement at the Fontana, California facility; provided further, where any such benefits consist of Employer payments to any employee benefits plan maintained by AIWU Local 61, under Section 302 of the Labor Management Relations Act, the Employer shall eliminate such payments and must itself furnish to the unit employees such equivalent benefits;

(3) post copies of this Order, including a Spanish translation thereof approved by the Regional Director of Region 31 of the Board, at all places at the Dura Art Stone, Inc. facility in Fontana, California where notices to employees are customarily posted. The copies of the Order are to be maintained during the pendency of the Board's administrative proceedings free from all obstructions and defacements.

(4) Within twenty days of the date of this Order, file with this court, along with a copy submitted to the Regional Director of Region 31 of the Board, a sworn affida-

vit from a responsible official at Dura Art Stone, Inc. explaining the manner in which Dura Art Stone, Inc. has complied with the requirements of this Order.

IT IS FURTHER ORDERED THAT AIWU Local 61, its officers, agents, successors, assigns and all persons acting in concert or participation with it:

(1) cease acting as the exclusive collective-bargaining representative of the finishing employees, welders, forklift operators, drivers, and housekeeping and janitorial employees of Dura Art Stone, Inc. at its plant in Fontana, California, and accepting recognition from Dura Art Stone, Inc., unless and until AIWU Local 61 is certified by the National Labor Relations Board as the exclusive collective-bargaining representative of such employees;

(2) cease giving effect to its collective-bargaining agreement with Dura Art Stone, Inc. executed on October 17, 2002, or any renewal, extension, or modification thereof;

(3) post copies of this Order, including a Spanish translation thereof approved by the Regional Director of Region 31 of the Board, at all places at the offices of AIWU Local 61 where notices to employees and members are customarily posted. The copies of the Order are to be maintained during the pendency of the Board's administrative proceedings free from all obstructions and defacements.

(4) Within twenty days of the date of this Order, file with this court, along with a copy submitted to the Regional Director of Region 31 of the Board, a sworn affidavit from a responsible official at AIWU Local 61 explaining the manner in which AIWU Local 61 has complied with the requirements of this Order.