Ernest L. SMITH, Jr., Darryl Payne, John Blom, Richard Cephas, Robert Dickey, Tony Perlstein, Leonard Riley, Roberta Silver, Alvin Soileau, Beverly Woods, and Diego Martinez, Plaintiffs,

v.

John BOWERS, as President of the International Longshoremen's Association, AFL–CIO, Defendant,

and

United States Maritime Alliance, Ltd. Defendant–Intervenor.

No. 04 Civ. 5484(VM).

United States District Court, S.D. New York.

Sept. 30, 2004.

---

Susan M. Jennik, Daniel Bright, Kennedy, Schwartz & Cure, PC, New York City, for Plaintiffs.

John Philip Sheridan, Gleason & Mathews, PC, New York City, for Defendant.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiffs Ernest L. Smith, Jr. ("Smith"), Darryl Payne, John Blom, Richard Cephas, Robert Dickey ("Dickey"), Tony Perlstein, Leonard Riley, Roberta Silver ("Silver"), Alvin Soileau, Beverly Woods, and Diego Martinez (collectively, "Plaintiffs")[1] have moved the Court for a preliminary injunction pursuant to Fed.R.Civ.P. 65: (1) prohibiting defendant International Longshoremen's Association, AFL–CIO ("ILA" or the "Union") and Defendant–Intervenor United States Maritime Alliance, Ltd. ("USMX") (collectively, "Defendants"), from implementing or enforcing the Master Contract negotiated between the ILA and USMX and submitted to the membership of the ILA for a ratification vote on June 8, 2004, pending trial of this matter; (2) enjoining the ILA from taking any action to discipline any of the Plaintiffs

for any conduct concerning the Master Contract ratification vote or their participation in the instant suit; and (3) directing the ILA to re-run the Master Contract ratification vote in a manner that protects Plaintiffs' and other ILA members' legal rights.

For the reasons discussed below, the Court denies Plaintiffs' motion. It concludes that while Plaintiffs are not barred by the Norris–LaGuardia Act from bringing suit, and are also not subject to the jurisdictional bar articulated in *Members for a Better Union v. Bevona*, 152 F.3d 58 (2d Cir.1998), they have failed to demonstrate a clear likelihood of success on the merits, irreparable harm, or proof that the balance of hardships tips decidedly in their favor at this preliminary stage of the proceedings.

## I. FACTUAL BACKGROUND

Plaintiffs are members of both the ILA and of individual ILA locals. Plaintiffs' lawsuit arises out of a ratification vote called and conducted by the ILA on June 8, 2004 to approve a global six-year Master Contract ("the Master Contract") governing the relationship between the Union and the shipping industry. Plaintiffs primarily allege that the vote was conducted in violation of Section 101(a)(1) of the Labor Management Reporting Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(1), though they also assert claims that impermissible retaliation against them has occurred or is threatened and that the Union violated its duty of fair representation through the conduct of the vote. LMRDA § 101(a)(1) states that:

---

**1.** Ten individual members of the ILA were named as Plaintiffs in the original Complaint. Plaintiffs seek leave to amend the complaint in order to add an eleventh plaintiff, Diego Martinez ("Martinez"), via their Motion for Preliminary Injunction. The ILA and USMX offer no objection to the amendment. Be-

cause no prejudice would result to Defendants by the addition of Martinez at this stage of the proceedings, the Court grants Plaintiffs' motion for leave to amend the Complaint for this purpose. Therefore, the Court treats Martinez as a plaintiff for purposes of this opinion.

Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

Plaintiffs allege that § 101(a)(1) and the Union's duty of fair representation were violated when the ILA, either directly or by sanctioning violative activities conducted by locals, completely disenfranchised members of three locals, provided inadequate notice and secrecy to voters in other locals, and coerced members of yet other locals to vote in favor of the Master Contract.

The Master Contract was intended to cover the terms and conditions of employment for the over 10,000 members of the Union for a six-year period beginning on October 1, 2004. (Transcript of Hearing on Plaintiffs' Motion for Preliminary Injunction on September 22 and 23, 2004 ("Hr'g Tr.") at 122–23). The union covers longshoremen throughout the East and Gulf Coasts; longshoremen on the West Coast are members of a different union, the ILWU. According to briefings submitted by the ILA and USMX, and testimony given by witnesses called by Defendants at the Court's hearing on this matter on September 22 and 23, 2004, negotiations for the Master Contract between ILA and USMX, the industry consortium formed in part to negotiate with ILA, began well before the scheduled September 30, 2004 expiration date of the current contract. Negotiations began early in order to make certain that a contract was in place at all times, thus avoiding the labor force disruptions that occurred on the West Coast upon expiration of the ILWU's contract.

(Hr'g Tr. at 141–42.) Negotiations resulted in a proposed Master Contract that was approved by the ILA's Wage Scale Committee on March 23, 2004. (*See* Declaration of Robert Bowers, dated September 14, 2004 ("Bowers Decl.") ¶ 8.)

The Master Contract itself provided that the contract would be submitted to all ILA members in good standing for a vote; the ILA distributed the Master Contract along with a letter dated May 5, 2004 (*see* ILA Proposed Master Contract, submitted as Plaintiff's Exhibit 1 at September 22, 2004 Hearing), indicating that the ratification vote would take place on June 8, 2004, from 6 AM to 6 PM. According to undisputed testimony given by ILA Secretary–Treasurer Robert Gleason ("Gleason"), notices of the intended voting date and time were distributed by the ILA using two different methods: first, it sent copies of the proposed Master Contract, along with a letter discussing the planned vote, to all active union members who were enrolled in the Union's Managed Health Care Trust Fund (a/k/a "MILA"), as well as to other Union members, including members in the New York–New Jersey area, whose names were on ILA mailing lists. (Hr'g Tr. at 117–18.) This process resulted in mailings going out to between 50 and 90 percent of the ILA membership eligible to vote, because not all locals subscribed to MILA for health care, and because union members had to work at least 700 hours in a given year to qualify for MILA and appear on MILA's mailing list. (Hr'g Tr. at 17, 123.) The Union also allegedly sent out additional copies of the May pre-election mailing to all locals and directed those locals to send the notices out using their own mailing lists. According to Gleason, the ILA could not send out notices to all ILA members because the locals are, and have always been, responsible for maintaining membership rolls for the Union. Gleason defended the use of the MILA list to accomplish

a direct mailing as a "belt-and-suspenders" approach to notifying members of the vote, since the ILA had notified members of all prior contract ratification votes merely by sending copies of the proposed contracts to locals for distribution to ILA members.[2] (Hr'g Tr. at 121–22.)

The ILA left the task of actually administering the elections to each of the locals, as it had done for all prior elections. It is unclear from the record whether the ILA undertook any efforts on or before June 8 to ensure that all locals were holding votes during the designated times and had provided proper notice to union members, though the ILA maintains that the locals were well-informed of the Union's election plans. It is clear, however, that the national ILA mailing, by itself, could not provide full notice of the details of locals' votes, since the mailing did not contain any information concerning *where* various locals' votes were to be held. Thus, it is certainly possible that some union members who were not members of MILA, and whose locals were lax in their responsibilities, received no notice of the vote, and that still others were aware of the ILA's intended voting date and time through the MILA mailing, but not of the voting location designated by their locals, even while the majority of members were at least aware of the ILA's intended voting schedule.

Several aspects of the conduct of the vote on June 8 are sharply disputed. Members of several locals claimed to experience or personally observe coercive tactics and improper supervision of voting and vote-counting at a Holiday Inn in Newark, New Jersey, the polling site used by Locals 1235, 1804–1, and 1. Plaintiffs focused their submissions and testimony on alleged improper tactics at the polling room used by Local 1235. These tactics purportedly included coercive conversations with those who were preparing to vote or with those who were observed voting against the contract, including Martinez (Hr'g Tr. at 42–44); the looming presence of various local leaders, including Local 1235 President Albert Cernadas ("Cernadas"); and resistance to outside observation of the voting process and the early and improper counting of votes, as allegedly observed by plaintiffs Dickey and Silver. (Hr'g Tr. at 60–64.) Plaintiffs claim that the local members' fear of repercussions in Local 1235 was well-justified, introducing for atmospherics evidence that Harold Daggett ("Daggett"), the President of Local 1804–1, which was holding votes in the same hotel as Local 1235, was indicted on July 24, 2004 along with Arthur Coffey ("Coffey"), the vice-president of the South East and Gulf Coast Region of the ILA and president of two ILA locals, for attempting to conspire to keep the Genovese crime family in control of the ILA. (*See* Press Release, United States Attorney's Office for the Eastern District of New York, Two Leaders of the International Longshoremen's Association Affiliated with the Genovese Family Indicted for Extortion ("Press Release"), attached as Exhibit 12 to Declaration of Daniel R. Bright dated Aug. 18, 2004.)

The ILA strongly disputes Plaintiffs' claims of impropriety through testimony by Vincent Aulisi ("Aulisi"), Secretary–Treasurer of Local 1235, and Jose Caseis ("Caseis"), member of Local 1235's executive committee, and through affidavit testimony of Cernadas. Aulisi admitted that those who supported the Master Contract may have spoken publicly in favor of it while in the voting room, but insisted that,

---

2. The MILA list had not even been in existence when prior contract ratification votes occurred; MILA was itself created in 1996 and went in to effect in 1998 as a result of the contract approved during the immediately prior ratification vote. (Hr'g Tr. at 118, 121.)

to his knowledge, no one was coerced or told to vote for the contract. (Hr'g Tr. at 72–73.) He also insisted that there was adequate space in the room for members to vote secretly. (*Id.* at 76.) Caseis admitted to personally encouraging Martinez to vote for the contract when he observed Martinez intending to cast a "no" vote. (Hr'g Tr. at 91–99.) He insisted, however, that he never attempted to coerce Martinez, nor did he stop Martinez from putting his "no" vote into the ballot box or fail to count votes of Martinez and others who voted against the contract when he became involved in the voting count. (Hr'g Tr. at 97–100.)

Plaintiffs' other allegations of wrongdoing primarily concern Locals 1408, 1526, and 2047. All of these locals scheduled their votes for a single meeting occurring after 6 PM on June 8, pursuant to notices given by the locals to their members. According to Plaintiffs, these locals violated their members' LMRDA rights by failing to give them the opportunity to vote between 6 AM and 6 PM on June 8, as all other locals had done. According to Smith, who was also an officer of Local 1408, the leadership of the local realized only at midday on the 8th that their voting procedures would be inconsistent with the ILA's mandate. Gleason stated that he personally warned Local 1408, when Smith called him that afternoon, that votes taken after 6 PM might not be counted. (Hr'g Tr. at 118–19.) Local 1408's President, however, was informed by the Union's Southeast District Council, that the votes *would* count. They therefore decided to proceed with a late vote, though not before calling Gleason to inform him of that fact. Gleason testified that he told the Local that the district council had no ability to make decisions regarding the conduct of the election, and informed them that he would have to consult with ILA lawyers to determine what to do if they proceeded with a late vote. (Hr'g Tr. at 119–20.) In the confusion, votes were cast well after 6 PM, and few members were present for the actual vote. Locals 1526 and 2047 also conducted their votes after 6 PM on that date.

The ILA reported its tabulation of the results of the ratification vote on June 14, 2004, concluding that the contract had been ratified by a vote of 5084 to 3920, with a further 131 votes being tabulated as "void." Results of late votes conducted by Locals 1526 and 2047 were initially included in the vote totals, with Local 1526 reported to have approved the contract by a vote of 180 to 25, and Local 2047 reported to have approved the contract by a vote of 29 to 9. (*See* International Longshoremen's Association, AFL–CIO, *Ratification Vote Results* (June 14, 2004), http://ilaunion.org/ratificationvoteresults.asp ("Ratification Vote Results"), attached as Exhibit 16 to Declaration of Daniel R. Bright dated Aug. 18, 2004.) Both of the locals thus reported low turnout, based on estimated total union membership of approximately 700 in Local 1526 and 177 in Local 2047. The approval rates reported by the union varied greatly by local. Locals in Maryland, Virginia, and South Carolina, for example, resoundingly rejected the proposed contract. Votes were split more evenly in Florida, with the exception of Local 1526 and two locals headed and controlled by Coffey. (*See id.*; Press Release, Bright Decl. Ex. 12.) The votes in those locals, Local 1922 and 1922–1, were a lopsided 172 to 6 and 210 to 4, respectively. (*See* Ratification Vote Results, Bright Decl. Ex. 16.) No votes from Local 1408 were counted in the tally announced on June 14. Votes in the New York-area locals were reported as follows: a Bayonne local which was under federal supervision voted against the contract 31 to 71, while the locals that voted together in the Newark Holiday Inn all approved the contract by significant margins, Local 1235 by a vote

of 426 to 105, Local 1 by a vote of 564 to 62, and Local 1804–1, the local headed by accused mobster Daggett, by a vote of 296 to 4.

Recriminations, allegations of malfeasance, and calls for a re-vote did not take long to materialize following the completion of the election on June 8. On June 10, 2004, members of Local 1408 filed a petition with the Union seeking an opportunity to vote on the Master Contract. (*See* Petition to Redress, attached as Exhibit 5 to Complaint.)[3] The petition was followed by a June 30 letter from Kennedy, Schwartz, & Cure, the law firm currently representing Plaintiffs, detailing a number of alleged voting improprieties arising out of the June 8 election. (*See* Letter from Susan M. Jennik, Kennedy, Schwartz & Cure, P.C., to John Bowers, President, International Longshoremen's Association, AFL–CIO (June 30, 2004), attached as Exhibit 6 to Complaint.) The letter stated that it was being sent on behalf of an organization entitled "Concerned ILA Rank and File Members," which included all but two of the current Plaintiffs, in response to an ILA letter dated June 14, 2004.

On July 12, 2004, the ILA sent its response to the June 30th Letter. (*See* Letter from John Bowers, President, International Longshoremen's Association, AFL–CIO, to Susan M. Jennik, Kennedy, Schwartz & Cure, P.C. (July 12, 2004) ("Bowers Letter"), attached as Exhibit 2 to Complaint.) The letter stated first that the ILA did not maintain local-by-local membership records and thus, that it was not responsible for notifying union members of the upcoming vote, even though it undertook efforts to notify members whose addresses it did have of the vote. Next,

the letter concluded that Local 1408's petition to allow it to conduct a vote would be denied, and that Plaintiff "Smith, a Local 1408 officer, knew or should have known well in advance of June 8, 2004 that Local 1408 President Vincent S. Cameron was not complying with the ILA's directive on the conduct of the ratification vote and furthermore, as a Local 1408 officer, he was in a position to rectify the non-compliance. Therefore, the remedy is not to rerun the vote but to charge the officers with malfeasance under the internal union discipline procedure which has already been directed." (*Id.* at 1–2.) The letter also stated that the ILA had decided to disqualify the votes of Locals 1526 and 2047, even though they were net in favor of the Master Contract, on the grounds that they were conducted after the 6 PM deadline, and made similar statements regarding Plaintiff Payne, a Local 1526 officer.

Next, the letter rejected claims regarding coercion at Local 1235's voting site, stating that the allegations were not made by members of any of the locals that voted there, and that the supervisor of poll workers at the Local 1235 polling site stated that the voting was conducted in a proper manner. The letter concluded by stating that, after the invalidation of the votes of Locals 1526 and 2047 and other minor adjustments were factored in, the final tally for the ratification vote would be 4873 to 3886.

On July 13, 2004, one day after the issuance of the letter, Plaintiffs brought suit against the ILA alleging violation of the LMRDA and the Union's duty of fair representation, and sought relief including a new contract vote and a prohibition

---

**3.** The petition states that there were approximately 900 members of Local 1408 who were eligible to vote, not the 1250 members stated in the Smith Declaration. (*Compare* Declaration of Ernest L. Smith, attached as Exhibit 4 to Declaration of Daniel R. Bright dated Aug. 18, 2004, *with* Petition to Redress, Compl. Ex. 5.)

against retaliating against the Plaintiffs. Plaintiffs moved for preliminary injunctive relief on August 18, 2004, seeking to avoid implementation of the Master Contract on October 1, 2004. The Court received full briefing on the weighty issues presented here by September 17, and held a hearing on Plaintiffs' motion on September 22 and 23.

## II. STANDARD OF REVIEW

The Second Circuit has established two different tests for establishing a plaintiff's right to preliminary injunctive relief. The first test, to be applied where a plaintiff seeks a preliminary injunction that *maintains* the status quo, requires the plaintiff to "establish irreparable harm and either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in its favor." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir.2002). The second, more stringent test, requires the plaintiff to prove a "clear or substantial likelihood of success on the merits." *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 37 (2d Cir.1995). It applies where "(i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Id.* at 33–34.

Plaintiffs, as expected, allege that the relief that they seek primarily maintains the status quo rather than alters it, and requests relief that could always be reversed or voided should the Court ultimately conclude that Plaintiffs are not entitled to conduct a binding Master Contract ratification re-vote. The ILA counters that the relief sought would alter the status quo by damaging the reasonable expectations of the parties to the Master Contract, by resulting in irreparable loss of wages and benefits promised under the new agreement, and by allegedly causing the entire East Coast longshore industry to be thrown in disarray once the old contract expires on September 30, 2004. The Union further alleges that Plaintiffs would receive substantially all of the relief they seek, which it defines as disruption of the Master Agreement and conduct of a re-vote, should the Court grant Plaintiffs' motion.

The Court concludes that, for reasons somewhat different from those elaborated by the ILA, Plaintiffs do seek a mandatory injunction and must therefore meet the heightened "clear or substantial likelihood of success on the merits" standard in order to prevail. Though "[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities or critics," *id.* at 34, Plaintiffs undeniably seek a court order compelling the ILA to conduct a second ratification vote for the Master Agreement. If such a re-vote does not occur, there is no way that Plaintiffs' LMRDA rights, which were allegedly violated, could be fully vindicated. Plaintiffs themselves admit in their reply brief that they "seek both prohibitory and mandatory injunctive relief," and state that they are prepared to meet the "substantial likelihood of success" standard attaching to mandatory injunctions. Since Plaintiffs cannot obtain the remedy they seek without obtaining mandatory injunctive relief, the Court concludes that they must meet the higher standard of proving a "clear or substantial likelihood of success on the merits" in order to prevail on their claims.

The Court rejects Defendants' arguments that the even-higher standards of proof of, as well as the technical peculiarities required by, the Norris LaGuardia Act ("NLA"), 29 U.S.C. § 101 et seq., apply to this case. The NLA provides that "[n]o court of the United States ... shall have jurisdiction" to provide injunctive re-

lief in a case growing out of a "labor dispute" except as provided in the Act. 29 U.S.C. § 101. The term "labor dispute" is defined very broadly and "includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment." 29 U.S.C. § 113(c). If a dispute is governed by the NLA, a court cannot issue an injunction unless it finds, based on "testimony in open court . . . in support of the allegations of a complaint made under oath," 29 U.S.C. § 107, that "unlawful acts have been threatened and will be committed; . . . [t]hat the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection," and that a number of other stringent standards are met. *See id.*

Plaintiffs, on the other hand, argue that the provisions of the LMRDA, which was passed well after the NLA and which specifically authorizes issuance of injunctions to further its goals, should trump the anti-injunction provisions of the NLA even if they could hypothetically be read to cover the instant dispute. Specifically, in support of their argument, Plaintiffs cite to Section 101(a)(1) of the LMRDA, 29 U.S.C. § 411(a)(1), which guarantees every union member "equal rights . . . to vote in elections or referendums of the labor organization," and Section 102 of the LMRDA, 29 U.S.C. § 412, which states that "[a]ny person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (*including injunctions*) as may be appropriate," *id.* (emphasis added).

The Court concludes that the NLA is inapplicable to the facts of this case. First, the NLA was intended to prevent courts from enjoining unions from striking or engaging in related activity except where urgent circumstances compelled such relief. It was adopted in 1932, when federal courts were generally perceived as allies of management and enemies of labor unions. *See, e.g., Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 250, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); William E. Forbath, *Law and the Shaping of the American Labor Movement* (1991). The NLA made it significantly more difficult for courts to enjoin strike-related activity, and thereby strengthened unions' power vis-a-vis employers. Though the current litigation could hypothetically fall within the NLA's broad definition of the term "labor dispute," applying the NLA's limits upon issuance of injunctions to the facts of this case would lead to absurd results. Given that, as Defendants strenuously argue, Plaintiffs are claiming violations of abstract legal rights in this case, how could Plaintiffs ever prove, as required by the NLA, that "the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection," 29 U.S.C. § 107, or many other of the predicate facts required by the NLA before an injunction may issue? It is against this backdrop that the ILA ironically argues that the NLA bars its own members from seeking injunctive relief in this case.

Second, as many courts have already noted, the NLA must be read in light of subsequent Congressional enactments in the same field, including the LMRDA.[4] As *Boys Markets* makes clear, Congress passed several important labor laws in the

---

4. The LMRDA was passed on September 14, 1959. *See* Labor–Management Reporting and Disclosure Act of 1959, Pub.L. 86–257, 73 Stat. 522 (1959) (commonly known as the Landrum–Griffin Act).

post-World War II era "without extensive revision of many of the older enactments, including the anti-injunction section of the Norris–LaGuardia Act. Thus it became the task of the courts to accommodate, to reconcile the older statutes with the more recent ones." *Boys Markets,* 398 U.S. at 251, 90 S.Ct. 1583.

The need to construe the NLA in light of the complex of newer labor statutes and regulations has led the Supreme Court to set aside the prohibition of the NLA when an injunction was necessary to carry out the purpose or duty of various conflicting statutes. In *Boys Markets* itself, the Court set aside the prohibition of the NLA to order an injunction to enforce an arbitration agreement and reasoned that "the core purpose of the [NLA was] not sacrificed by the limited use of equitable remedies to further ... important polic[ies]." *Id.* at 253, 90 S.Ct. 1583. In *Pittsburgh & Lake Erie R.R. Co. v. Railway Labor Execs.' Ass'n,* 491 U.S. 490, 514, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989), the Court found that the Railway Labor Act took precedence over the NLA and stated that "[t]he prohibition of the [NLA] must give way when necessary to enforce a duty specifically imposed by another statute." *See also Brotherhood of R.R. Trainmen v. Chicago River & Ind. R. Co.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957) (concluding that the NLA does not bar an injunction from being issued related to a "minor dispute" under the Railway Labor Act).

The Second Circuit has followed this line of reasoning to conclude that the NLA did not prohibit a court from imposing a RICO injunction that would affect a contract between the ILA and the shipping industry. *See Local 1814, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n,* 965 F.2d 1224 (2d Cir.1992), *cert. denied,* 506 U.S. 953, 113 S.Ct. 406, 121 L.Ed.2d 331 (1992) (holding that the civil enforcement provisions of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68, took precedence over the prohibitions of the NLA). Similarly, the Second Circuit has found another provision of the LMRDA to trump the NLA's prohibitions. *See National Ass'n of Letter Carriers, AFL–CIO v. Sombrotto,* 449 F.2d 915 (2d Cir.1971) (holding that when LMRDA allows for a trusteeship to be imposed, anti-injunction provisions of NLA are inapplicable). Several other circuits have explicitly declared that the NLA does not preclude courts from entering injunctions that are permissible under the LMRDA. *See, e.g., Parks v. IBEW,* 314 F.2d 886, 923 (4th Cir.1963) ("Obviously, since § 102 of the LMRDA, 29 U.S.C. § 412, expressly provides that relief may include injunctions, the provisions of the [NLA] are inapplicable."); *International Brotherhood of Boilermakers v. Local Lodge D238,* 865 F.2d 1228 (11th Cir.1989) (concluding that section 104(b) of the NLA is inapplicable where a union imposes a trusteeship for a permissible purpose under the LMRDA).

Because the important policies advanced by the LMRDA, including Section 101(a)(1) of the Act, "would be 'imperiled if equitable remedies were not available to implement it,' the Norris–LaGuardia Act's policy of nonintervention by the federal courts should yield to the successful implementation' of the important federal policy" in this case, *Local 1814,* 965 F.2d at 1237–38 (quoting *Boys Markets,* 398 U.S. at 252, 90 S.Ct. 1583), and provide Plaintiffs with equitable relief if they are ultimately found entitled to it under federal law.

The Court rejects USMX's argument that the NLA should apply in this case simply because it, a consortium of employers, is a party to this proceeding and because the Master Contract that is the subject of this dispute has already been executed. In *Local 1814,* a case involving

the same union and several of the same counsel who have appeared in this case, the appellate court upheld an injunction that vitiated an arbitration provision of a subsisting collective bargaining agreement between a shipping association and the union in order to effectuate policies important to the RICO statute. The NLA did not serve as a bar to injunctive relief in that case, nor should it here. Nothing in the LMRDA indicates that the policies it advances are any less worthy of consideration by the Court than those advanced by the RICO statute, nor that the law's explicit provision for injunctive relief, 29 U.S.C. § 412, is inapplicable where an injunction would affect a subsisting labor agreement.

Furthermore, the Court notes that USMX cannot argue either that it was an unwilling participant in this proceeding, or that it had no notice of potential LMRDA claims at the time it executed the agreement with the Union. USMX was not named as a defendant; it moved to intervene, and therefore voluntarily made itself subject to this Court's orders. USMX's claims that its agreement with the ILA is injunction-proof because it relied on the ILA's assurances that the ratification was valid is also foreclosed by ILA officers' own testimony that they were aware of election-related issues even before the contract was signed. In any event, as the Court concludes above, even an otherwise-valid, subsisting contract may be subject to the dictates of an injunction issued pursuant to the LMRDA.

## III. DISCUSSION

### A. PLAINTIFFS HAVE FAILED TO ESTABLISH A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS

 Though Plaintiffs have alleged and introduced some evidence tending to support the conclusion that the ILA violations

of Section 101(a)(1) of the LMRDA, the Court ultimately concludes that they have not established a sufficient likelihood of success on the merits to gain injunctive relief at this stage of the proceedings.

### 1. LMRDA § 101(a)(1) Claims

Plaintiffs' LMRDA § 101(a)(1) claims are based primarily on the disqualification of three locals' votes and the alleged improprieties at Local 1235's voting site, even while other locals gave their members adequate notice of the vote and provided them with ample opportunity to vote in secret and without outside influence. The definitive Second Circuit case construing the rights conferred by Section 101(a)(1), *Members for a Better Union v. Bevona*, 152 F.3d 58 (2d Cir.1998), notes that LMRDA § 101(a)(1) does not provide any absolute voting rights to members. Rather, according to *Bevona*, the statute's statement granting union members "equal rights and privileges" to vote in union elections and referenda, 29 U.S.C. § 401(a)(1), "curbs no abuse other than *discrimination* against some union members and in favor of others with respect to voting rights.... To be viable, a claim under § 101(a)(1) must therefore allege denial of some privilege or right to vote which the union has granted to others." *Bevona*, 152 F.3d at 65 (emphasis in original). Failure to allege the necessary discrimination in grant of voting rights deprives a court of subject matter jurisdiction over the case, *see id.* at 65–66.

The Court concludes that Plaintiffs have, at least as to the alleged disenfranchisement of three locals comprising more than fifteen percent of the Union's membership, made sufficient allegations of discrimination in this case to rise over the jurisdictional bar imposed by *Bevona*. Unlike *Bevona*, in which all parties were given equal rights to vote but some alleged that

uniformly-applied voting procedures limited dissenting voices or inconvenienced others with conflicting work shifts, in this case Plaintiffs have made undisputed allegations that some union members were able to vote on the contract on June 8, 2004, while others, especially Local 1408's between 900 and 1250 members, were not. The number of members who were disqualified alone very likely exceeds the Master Contract's less than 1000-vote margin of victory, such that the results hypothetically may have been different had the three locals' members voted during normal hours.[5] Plaintiffs' pleadings also were careful to allege disparate treatment among locals, with Local 1588 establishing a baseline that several other unions failed to meet. The undisputed fact that three locals' votes were not counted due to a decision of the ILA suggests that at least some of the Plaintiffs were denied "some privilege or right which the union has granted to others," *Bevona*, 152 F.3d at 65, and enables Plaintiffs to avoid dismissal under *Bevona's* anti-discrimination jurisdictional rule.[6]

■ Turning to the merits of Plaintiffs' Section 101(a)(1) claim, the Court concludes that the ILA has made a strong showing that its conduct with respect to the election complied with its constitution, bylaws, and code of ethics, and was reasonable under the circumstances. While LMRDA § 101(a)(1) promises "equal rights and privileges" related to voting, it explicitly makes those rights *"subject to reasonable rules and regulations in such organization's constitution and bylaws."* *Id.* (emphasis added).

Here, the Union explicitly noted in its recently-adopted Code of Ethics, upon which Plaintiffs rely in support of their claims that every member's right to "vote in free, fair and honest elections" was "[s]ubject to reasonable rules, regulations, and qualifications." (ILA Code of Ethics, submitted as Plaintiff's Exhibit 2 at September 22, 2004 Hearing, at § I cl. 2) Three relevant "rules, regulations, and qualifications" governed the conduct of the contract ratification vote: (1) the ILA's determination that the contract ratification vote would occur between 6 AM and 6 PM on June 8, 2004, and be administered by each of the locals; (2) the ILA's decision to notify individual ILA members primarily through their locals, but also provide supplemental notice through the MILA list; and (3) the ILA's decision to disqualify those who did not vote during the designated period, including all members of Locals 1408, 1526, and 2047.

The Court finds that, based on the evidence currently before it, that the Union's disqualification of the three locals' votes appears reasonable under the circumstances. First, the Union's decision to conduct a ratification vote on June 8 from 6 AM to 6 PM was a reasonable one; the need for a single date and time during which union members in more than eighty locals spread throughout the East and Gulf Coasts could vote on the proposed Master

---

**5.** The Court thus does not reach the question of whether a Court-ordered re-vote may be available as a remedy even if the alleged improprieties would not have affected the outcome of the vote.

**6.** The fact that the ILA made all final determinations concerning the conduct of the June 8 contract ratification vote, including disqualifying three locals' votes in response to protests, renders it impossible for the Union to disclaim responsibility for any LMRDA violations that may have occurred related to the June 8 vote. As discussed below, however, this does not mean that the ILA cannot reasonably delegate the administration of elections to locals; it simply means that the Court will examine whether the ILA's own conduct with respect to pre-election notice, the conduct of the election itself, and the handling of protests subsequent to the vote complied with the requirements of the LMRDA.

Contract is self-explanatory. Allowing each local to choose its own voting date and time would not be as practical, as it would allow locals voting later to gain knowledge of how other locals' votes had come out, would greatly complicate the ILA's task of compiling and certifying votes, and would introduce even more logistical complexities by making it impossible for the ILA to give *any* form of notice regarding voting dates and times to its membership. The Union's decision to delegate voting administration to locals also appears reasonable, given that it had always done so in the past without evidence on the record before the Court of any problems inherent in that process, and that the staff of the national union could not effectively administer an election in dozens of locations throughout the country, where it did not even maintain a master list of union members entitled to vote. Since locals were the only organizations that had sufficient staff to administer elections, knowledge of local facilities to choose voting sites, and records related to members' qualifications, it made sense for them to be tasked with the administration of the votes.

Second, the Court finds that the notice given by the ILA appears to have been reasonable under the circumstances. Gleason submitted uncontroverted testimony indicating that the ILA mailed copies of the proposed contract, along with notice of the designated voting date and time, to all MILA members, as well as to all locals for direct distribution to their members. While Plaintiffs allege that the Union's use of the MILA mailing list violated the LMRDA by excluding those who did not qualify for the health plan and who were disproportionately harmed by the proposed Master Contract, the mailing to the MILA list was never intended by the Union, as Gleason testified, to serve as the sole means of communicating information about the vote to the Union's membership.

Gleason also testified that in the past, the Union had always notified members of ratification votes exclusively via the locals because it lacked a complete and current membership list, and was merely using the MILA list as a supplemental means of disseminating information about the ratification vote. Regardless of the purported flaws in the MILA list as a means of notifying members, Plaintiffs have failed to demonstrate why the ILA's preexisting notice procedures, which relied on local leadership to distribute notice, were unreasonable as well.

Third, based on the evidence currently before the Court, the Union's decision to disqualify the votes of the three locals who had voted after 6 PM appears reasonable under the circumstances. Though the Court by no means condones the disqualification of large numbers of voters, the Union was placed in a significant dilemma by the three locals' failure to follow the Union's clear and explicitly-communicated instructions regarding the conduct of the contract ratification vote. If the Union had agreed to allow those three locals to vote after 6 PM, then it could have faced allegations of another form of discrimination: that members in other locals who had approached the polls shortly after 6 PM but who were turned away were unfairly deprived of *their* rights to vote. Instead, the Union chose to adhere to its preexisting rule designating a single twelve-hour period during which votes on the Master Contract would be allowed.

Plaintiffs are correct that this decision left significant numbers of union members unable to cast their ballots at all, but they are not wholly accurate when they attempt to rest the blame wholly at the feet of the parent Union. It seems highly improbable that *no* member of the three locals' leadership received neither the MILA mailing, nor the bulk Master Contract distribution,

nor the voting instructions mailed from the ILA to locals, all of which listed June 8, 2004, from 6 AM to 6 PM, as the designated voting period. Even if a popularly-elected local union leader chose to read the voting instructions as hortatory rather than mandatory, other members of those locals very likely had actual notice of the parent union's instructions through the MILA mailing or other means and could have realized at some point before June 8th arrived that the locals' noncompliance with Union directives could place their votes at risk. The resulting disqualifications of voters were unfortunate, but do not appear to have been the result of any LMRDA violation committed by the national Union itself.

■ Even if the Court might have reached a different conclusion regarding the proper means of operating the Union's election procedures or remedying the errors that occurred on the date of the vote, "a court should defer to a union official's reasonable interpretation of his union's constitution even if the court might not have reached the same interpretation." *Hill v. Chao*, 229 F.Supp.2d 227, 232 (S.D.N.Y.2002) (quoting *Felton v. Ullman*, 629 F.Supp. 251, 255 (S.D.N.Y.1986)). Therefore, the Court does not endeavor to examine any proposed, *more* reasonable, procedures that could have avoided the unfortunate occurrences on June 8th. The Court notes, however, that its view of the ILA's actions might have been different if, hypothetically, Plaintiffs were able to put forward evidence suggesting that the ILA had colluded in some way with the leadership of three locals to suppress the vote against the Master Contract, or that the ILA's decision to disqualify the locals' votes was itself impermissibly motivated and therefore, unreasonable. *See Cunningham v. Local 30, International Union of Operating Engineers, AFL–CIO*, 234 F.Supp.2d 383, 393 (S.D.N.Y.2002) (discussing the possibility that, as contemplated by *Brown v. Sombrotto*, 523 F.Supp. 127, 133 (S.D.N.Y.1981), defendants' intent is relevant to the court's determination whether or not to grant the relief sought). However, the evidence currently tends to suggest that the Union's disqualification ruling was unbiased and driven by compliance with its preestablished procedure for the vote, in that the votes of Locals 1526 and 2047 were disqualified along with the vote of Local 1408, even though those locals had originally had their votes counted and had both voted strongly in *favor* of the Master Contract. Evidence of this theoretical type, of course, may not exist at all, or may be discoverable through normal processes, but it is not currently present in the record before the Court. Therefore, the Court denies Plaintiffs' motion for a preliminary injunction based on its LMRDA 101(a)(1) claim based on the disqualification of votes cast by Locals 1408, 1526, and 2047.

The Court also declines to grant a preliminary injunction based on alleged improprieties at Local 1235. While the Court found testimony proffered by Plaintiffs Martinez and Dickey to be credible, it was contradicted in several critical respects by Aulisi and Casais on behalf of the Local. In particular, the Local asserted that there was adequate opportunity for individuals to cast secret ballots, that no one sought to coerce dissenters into voting for the contract, and that vote-counting was conducted properly but begun shortly before 6 PM on the date of the vote. Even if the Court agreed that evidence tends to show that certain members of Local 1235 "crossed the line" in their public advocacy on behalf of the contract while in or around the polling place, the evidence is not sufficiently clear to support the grant of preliminary injunctive relief that would bind the entire nation, not just the Local itself, at this stage of the proceedings. The same is true of other, assorted flaws

in various locals' notice and voting secrecy procedures anecdotally asserted in Plaintiffs' submissions to the Court.

### 2. LMRDA Retaliation Claims

■ Plaintiffs allege that preliminary injunctive relief is necessary to protect them from retaliation prohibited by LMRDA § 609, 29 U.S.C. § 529, which prohibits unions from retaliating against their members for exercising LMRDA-protected rights. The LMRDA-protected rights that Plaintiffs allege serve as the basis for the Union's threatened retaliation include Plaintiffs' exercise of their right to engage in free speech by protesting the conduct of the ratification vote, protected by LMRDA § 101(a)(2), 29 U.S.C. § 411(a)(2), and by exercising their rights to participate in court proceedings against the union, allegedly protected by LMRDA § 101(a)(4), 29 U.S.C. § 411(a)(4).

Without deciding whether these LMRDA rights were exercised by Plaintiffs, the Court determines that the record does not currently support a grant of preliminary injunctive relief on Plaintiffs' retaliation claims. Plaintiffs have not alleged or testified to any actual or threatened retaliation, with one exception. That exception, contained the Union's July 12, 2004 letter to Plaintiffs' counsel described above, could reasonably be read to threaten certain plaintiffs with disciplinary proceedings as a result of the problems with voting that took place at their locals, or as subtext, to threaten them with discipline in retaliation for their complaints. However, the letter is far from clear regarding its intended target; it could be just as plausibly read, and in fact was read by one of the plaintiffs, to simply be threatening local presidents with punishment. Furthermore, all parties agree that the date for disciplinary proceedings to actually be instituted against Plaintiffs for any actions arising out of the June 8 election has already passed.

The Court recognizes that Plaintiffs' participation in this suit raises their profile in the Union and may subject them to an increased likelihood of retaliation, but the Court cannot grant injunctive relief, even at a preliminary stage, based on mere surmise. Should any actual retaliation against any of the plaintiffs occur or be threatened, Plaintiffs are welcome to seek relief against the ILA at that time.

### 3. Duty of Fair Representation Claims

According to *Sim v. New York Mailers' Union No. 6*, 166 F.3d 465, 472 (2d Cir. 1999), a union does not breach its duty of fair representation unless "its actions can fairly be characterized as so far outside a wide range of reasonableness that they are wholly arbitrary, discriminatory, or in bad faith," *id.* (internal quotation marks, citations, and alterations omitted), and that "a causal connection [exists] between the union's wrongful conduct and the alleged injuries." *Id.* In light of the Court's resolution of Plaintiffs' LMRDA § 101(a)(1) claim, and the heightened standards of proof that apply to a duty of fair representation claim under the Second Circuit's caselaw, the Court also finds that Plaintiffs have failed to demonstrate a "clear or substantial likelihood of success on the merits" of their duty of fair representation claim.

## B. IRREPARABLE HARM

Plaintiffs must prove that they will be irreparably harmed by the denial of *preliminary* injunctive relief before they can claim entitlement to a preliminary injunction. In the Second Circuit, "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm *before a decision on the merits can*

*be rendered."* *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir.1985) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.,* 719 F.2d 42, 45 (2d Cir.1983) (emphasis added)).

■ The Court concludes that, while Plaintiffs are correct in stating that the loss of voting rights protected by the LMRDA is inherently irreparable at law, they fail to demonstrate why a further delay in vindicating these rights would be irreparable. As Plaintiffs point out, "[d]e-privations of voting rights long have been regarded as irreparable because they obviously cannot be remedied by an award of damages." *Craig v. Boudrot,* 40 F.Supp.2d 494, 501 (S.D.N.Y.1999). Thus, if Defendants are found at trial to have violated Plaintiffs' LMRDA rights, Plaintiffs will at that time be entitled to equitable relief on the grounds that the harms proven would be irreparable. Plaintiffs, however, have failed to demonstrate why delaying a re-vote or other injunctive relief that the Court might award after trial would itself cause irreparable harm. Though the injunctive relief that may be ordered after the Master Contract takes effect would have to be more complex to properly vindicate Plaintiffs' rights without throwing the shipping industry into chaos, Defendants insist that a grant of relief after trial would impose no more hardship than a grant of preliminary relief at this stage of the proceedings. Furthermore, the Court notes that, while the Master Contract about to take effect may not be to the liking of Plaintiffs, it is difficult to see how its imposition during the pendency of this action could be considered harmful to them. Though the Master Contract does contain some lessening of medical benefits for union members who work less than 1300 hours per year (Hr'g Tr. at 20–21), it does provide significant raises and other benefits as compared to the current agreement for Union members. Plaintiffs have failed to introduce any evidence sug-gesting that they will be economically injured by imposition of the agreement. While not dispositive, Plaintiffs' failure to allege any economic harm resulting from denial of a preliminary injunction further strengthens the Court's conclusion that Plaintiffs have not demonstrated that they will be irreparably harmed if injunctive relief is not granted during the pendency of this action.

## C. BALANCE OF HARDSHIPS

■ The Court also concludes that Plaintiffs have failed to establish that the balance of hardships tips decidedly towards them. The Court agrees that, if the only hardships that Defendants would suffer due to the preliminary injunction were the "expense associated with conducting a new referendum," *Hayes v. International Organization of Master, Mates & Pilots,* 670 F.Supp. 1330, 1334 (D.Md.1987) (quoted in Pls.' Mem. of Law at 24), the outcome of this prong of the analysis may have been different. But, while any delay in vindicating Plaintiffs' LMRDA rights may impose a psychic hardship on Defendants and allow a labor practice that may or may not violate the LMRDA to at least temporarily "reach fruition," *In re McDermott,* 298 F.Supp.2d 905, 911 (C.D.Cal. 2003), granting the relief at a preliminary stage of the proceedings will impose significant hardships, not only on Defendants, but on individual members of the ILA who are not parties to the proceeding and who have a reasonable expectation that they will receive the benefits of the new Master Contract on October 1, 2004.

In addition to imposing expenses associated with conducting a new referendum, preliminary injunctive relief would also risk destabilizing the East Coast shipping industry. The Court does not believe that such disruptions would certainly occur, as Defendants are in the best position to

avoid such difficulties if injunctive relief were granted, but disruption is always a possibility where no contract would be in place to definitively govern the relationships between the Union and USMX while the injunction is in place, and where old offers could be taken off the table or new demands issued as a result of changed circumstances since the Master Contract was negotiated. In addition, the imposition of preliminary injunctive relief would impose significant hardships upon those whose LMRDA rights were clearly not violated and who stand to benefit economically from the agreement if it goes into effect.

## IV. ORDER

For the reasons discussed above, it is hereby:

**ORDERED** that Plaintiffs' motion for leave to amend the Complaint to add Diego Martinez is granted; it is further

**ORDERED** that Plaintiffs' motion for a preliminary injunction is denied; and it is finally

**ORDERED** that the parties confer and submit by October 8, 2004, for the Court's approval a proposed case management plan to govern the schedule of pretrial proceedings in this case.

**SO ORDERED.**