# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Mark Kiddo, Joan Hordusky, Mike Dzurko, Christine Arnone, Jennie Clay, Madelyn Groover, Melissa Guzowski and Jeff Granger | : : : : : | |
| v. | : : | No. 468 C.D. 2019 Argued: May 11, 2020 |
| American Federation of State, County and Municipal Employees, Local 2206; American Federation of State, County and Municipal Employees, District Council 85; Randy Procious in his official Capacity; Shane Clark in his official Capacity; and Erie Water Works | : : : : : : : : : : | |
| Appeal of: American Federation of State, County and Municipal Employees, Local 2206; American Federation of State, County and Municipal Employees, District Council 85; Randy Procious; and Shane Clark | : : : : : : : | |

**BEFORE:**   HONORABLE RENÉE COHN JUBELIRER, Judge
HONORABLE CHRISTINE FIZZANO CANNON, Judge
HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

<u>OPINION NOT REPORTED</u>

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**                    **FILED: August 3, 2020**

American Federation of State, County and Municipal Employees (AFSCME), Local 2206 (Local 2206), AFSCME, District Council 85 (District Council 85) (together, Union), Randy Procious, and Shane Clark (collectively, Union Defendants) appeal from the March 19, 2019 Order of the Court of

Common Pleas of Erie County (trial court) that granted the Motion for Preliminary Injunction/Renewed Motion for Preliminary Injunction and Request for Emergency Relief (Motion) filed by Mark Kiddo, Joan Hordusky, Mike Dzurko, Christine Arnone, Jennie Clay, Madelyn Groover, Melissa Guzowski, and Jeff Granger (collectively, Employees). The trial court enjoined Erie Water Works (EWW) from voting on and entering into any contract with Union until Employees' civil complaint (Complaint), in which they alleged the Union Defendants breached their duty of fair representation to Employees during the presentation and ratification of a new collective bargaining agreement (CBA) by their bargaining unit, was resolved. Prior to the trial court's Order, a Hearing Officer of the Pennsylvania Labor Relations Board (PLRB) found that EWW had committed unfair labor practices under the Public Employe Relations Act[1] (PERA) relating to the CBA bargaining and directed EWW's Board of Directors (Board) to vote on the CBA. On appeal, Union Defendants argue the trial court abused its discretion in granting the Motion because Employees did not meet any of the six requirements for obtaining a preliminary injunction, and, in particular, did not establish that they would suffer immediate and irreparable harm that was not speculative or merely economic if the Motion was denied.

## I. Background

### A. Complaint

On December 5, 2018, Employees filed the Complaint alleging the following. Employees work for EWW, a municipal water authority for the City of

---

[1] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101-1101.2301.

Erie (City), and are members of Local 2206, which is a part of District Council 85.[2] Local 2206 represents 18 to 20 EWW employees[3] and some City employees. Mr. Procious, who works for the City, and not EWW, is President of Local 2206, and Mr. Clark is employed by District Council 85. EWW and Local 2206 entered into a CBA governing Employees for the period between January 1, 2013, and December 31, 2017 (Prior CBA). Before the Prior CBA's expiration, EWW and Union began negotiations on a successor CBA, and Mr. Procious and Mr. Clark were members of Union's negotiating team. Mr. Kiddo and another employee advised members of Union's negotiating team and/or Mr. Procious that they wanted the new CBA to include, among other things, a post-employment subsidy, which is a monthly stipend a retiree receives until the retiree becomes eligible for Medicare. This benefit was available to EWW's other unionized employees, who were represented by the Teamsters Union, and non-unionized administrative employees.

Employees alleged that, in the course of negotiations, EWW presented to Union's negotiating team a document titled "Final Offer" on December 22, 2017. The Final Offer included two options that, relevant to the current dispute, provided as follows: Option 1, a 5-year contract that included a post-employment subsidy of $400 per month, a 3% wage increase over the contract term, and a provision that placed employees hired after January 1, 2018, in a defined contribution retirement plan; and Option 2, a 4-year contract that included a 2.5% wage increase but

---

[2] Ms. Hordusky worked for EWW and was a member of Local 2206 during the underlying events but retired from her employment on October 30, 2018, and, therefore, is no longer a member of Local 2206. (Complaint (Compl.) ¶ 8.)

[3] EWW is a "public employer," Employees are "public employe[s]," and Union is an "employe organization" and the exclusive representative of Employees pursuant to, respectively, Sections 301(1)-(3) and 606 of PERA, 43 P.S. §§ 1101.301(1)-(3), 1101.606.

maintained the defined benefit pension plan for all employees. Employees aver that EWW intended, and expressed to Union's negotiating team, that its Final Offer contained both options and that both options should be presented to the bargaining unit for potential ratification. According to the Complaint, per a January 4, 2018 email with EWW, Mr. Clark indicated he understood the Final Offer to include both options and questioned whether both options had to be presented to the bargaining unit members, but, in subsequent communication on January 5, 2018, Mr. Clark advised EWW that Union was not obligated to present the Final Offer to the members and would only be presenting Option 2 for ratification.

On January 11, 2018, Union negotiating team presented, as EWW's Final Offer, Option 2 to the membership for ratification. Employees allege the membership was not informed that the Final Offer had contained any other options or that EWW had been willing to agree to other options. They further aver the ratification meeting involved "heated" discussion during which Union officials stated that if the membership did not approve the presented offer, people would lose their pensions. (Complaint (Compl.) ¶¶ 42-43.) "In reality, [Employees] would not lose their pensions if they rejected the . . . [presented o]ffer." (*Id*. ¶ 44.) The membership voted to ratify the presented offer. (*Id.* ¶ 43.) Employees allege that had Mr. Procious and Mr. Clark informed the bargaining unit that Option 1 was available, rather than concealing that information, Employees would not have ratified Option 2, but would have voted for Option 1. Employees presented affidavits in this regard.

Employees allege that, thereafter, EWW sent a letter to the bargaining unit members, dated February 8, 2018, informing them that the Final Offer had

4

included the two options, attached to which was a document purportedly reflecting the two options presented to the negotiating team. Through emails on February 14 and 15, 2018, Employees and other bargaining unit members conferred and 13 members, a majority of the bargaining unit, stated that they wanted a revote. On February 21, 2018, Mr. Kiddo filed an internal grievance against Mr. Procious and Mr. Clark requesting that the January 11, 2018 vote be cancelled and a revote be held to consider both options. After a hearing on the grievance, AFSCME Judicial Panel Chairperson Richard Abelson issued a decision (Abelson Decision), finding that Mr. Procious and Mr. Clark had not violated Section 7 of the AFSCME Constitution,[4] pertaining to membership participation in ratifying contracts. Mr. Kiddo appealed to AFSCME's full Judicial Panel, which affirmed.

Based on the above facts, Employees assert a single count in the Complaint. They contend Union Defendants are trustees of the rights of the bargaining unit members, who are beneficiaries of the fiduciary obligations owed to them by Union, and, as such, bear a heavy duty of fair representation to those it is bound to protect. (*Id*. ¶ 60.) Employees allege Union Defendants breached this duty of fair representation by, among other things: misrepresenting and/or concealing what EWW's Final Offer was to the bargaining unit for consideration and ratification;

---

[4] Section 7 of the AFSCME Constitution provides:

> Members shall have the right to full participation, through discussion and vote, in the decision-making processes of the union, and to pertinent information needed for the exercise of this right. This right shall specifically include decisions concerning the acceptance or rejection of collective bargaining contracts, memoranda of understanding, or any other agreements affecting their wages, hours, or other terms and conditions of employment. All members shall have an equal right to vote and each vote cast shall be of equal weight.

(Reproduced Record (R.R.) at 37a.)

5

misleading the bargaining unit membership of the consequences of not ratifying Option 2; and violating Union's internal rules.[5] This reflects, they argue, that Union Defendants were not acting in good faith, in a reasonable manner, and without fraud. Due to Union Defendants' actions, Employees, and the membership, ratified a less favorable offer, resulting in Employees suffering or in the future suffering pecuniary injuries including a loss or decrease of pay raise and loss of the post-employment subsidy.

### B. Union's Unfair Labor Charge Against EWW

Following the January 11, 2018 ratification vote and EWW's February 8, 2018 letter to the bargaining unit members, EWW decided it would not present Option 2 to its Board for a vote. As a result, Union filed unfair labor practice charges against EWW with the PLRB on March 8, 2018. (Trial Ct. Op. at 7.) The Hearing Officer held a hearing on the unfair labor charges in July 2018, and, on January 31, 2019, issued a proposed decision and order sustaining the unfair labor charges against EWW. (Reproduced Record (R.R.) at 575a-85a.) The Hearing

---

[5] The duty of fair representation requires unions to "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). Unions have a fiduciary obligation to represent all of their members fairly and to protect the members' rights. *Connelly v. Steel Valley Educ. Ass'n*, 119 A.3d 1127, 1134 (Pa. Cmwlth. 2015). "A union's actions can be considered arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness . . . as to be irrational." *Id.* (internal citations and quotations omitted). A civil claim based on a union's alleged breach of its duty of fair representation does not implicate PERA because "[i]ndividual claims by employees against [their] union . . . do not qualify as unfair labor practices." *Id.* at 1133 (quoting *Case v. Hazelton [sic] Area Educ. Support Pers. Ass'n (PSEA/NEA)*, 928 A.2d 1154, 1161 (Pa. Cmwlth. 2007)). Therefore, jurisdiction over duty of fair representation claims is within the local county court of common pleas, not the PLRB. *Id.*

6

Officer found that EWW had violated PERA because, among other reasons, EWW directly negotiated with the bargaining unit, the "Final Offer" it sent to bargaining unit members differed from the "Final Offer" presented to the negotiating team despite being characterized as accurate and complete by EWW, and EWW was working directly with Mr. Kiddo and his counsel to delay the Board's vote pending resolution of the Complaint.[6]  (*Id.* at 582a-84a.)  The Hearing Officer directed EWW to "[i]mmediately bargain in good faith, and submit the terms of the CBA as it existed in Option 2 on December 22, 2017, without the inclusion of Option 1 or any other unaccepted proposal, to the Board . . . for ratification[.]"  (*Id.* at 585a.) EWW filed exceptions to the proposed decision and order on February 20, 2019, but EWW withdrew those exceptions after the trial court issued the Order granting the Motion.

### C. Motion

On December 18, 2018, Employees filed the initial Motion for Preliminary Injunction, seeking to enjoin EWW from executing Option 2 as ratified on January

---

[6] The Hearing Officer explained that EWW's arguments that it intended the two options to be inseparable and to be presented to the bargaining unit members were "belied by its own proposal document, drafted by labor counsel, which expressly state[d] that 'the Union will select one of the following options to apply to all of its members.'"  (R.R. at 582a (citation omitted).) The Hearing Officer found, crediting Mr. Clark's testimony, that EWW and the negotiating team had reached an agreement to present Option 2 to the members and EWW later changed its mind and insisted on the presentation of both options.  (*Id.*)  Further, according to the Hearing Officer, EWW imposed a condition on its approval of the successor CBA by insisting that the choice stated in the Final Offer be presented to the bargaining unit and then refused to hold a vote on the CBA until Union acceded to the demand, which is an unfair labor practice.  (*Id.* at 583a.)  The Hearing Examiner also found that EWW engaged in unfair labor practices by communicating directly with the bargaining unit members, in misrepresenting to the membership what was actually presented to the negotiating team, and in stating that its representation was the "accurate and complete version of the [F]inal [O]ffer," when that representation was not.  (*Id.*)

11, 2018, by the bargaining unit.[7]  Therein, Employees alleged many of the above facts regarding the ratification of Option 2 during the January 11, 2018 meeting and the events that followed.  Employees averred additional facts they believed would establish the necessary requirements to obtain a preliminary injunction. Union Defendants filed a Memorandum of Law opposing the Motion and the affidavit of Mr. Clark.  In the Memorandum of Law, Union Defendants argued that Employees could not meet the standard for obtaining a preliminary injunction. They disputed that EWW advised them that it expected both options of the Final Offer to be presented to the bargaining unit.  Rather, Mr. Clark indicated the language of the Final Offer reflected it was Union's choice as to which option to present and that Union did not agree, at the December 22, 2017 meeting, to present both options.  Union's negotiating team told EWW's negotiating team that it was going to present Option 2 to the membership at that meeting.  Citing various email correspondence, Union Defendants indicated that they again informed EWW of their understanding prior to the January 11, 2018 meeting with the bargaining unit members.

An initial hearing was held in February 2019, but the trial court continued the hearing to June 2019, with the understanding that no vote would be scheduled by EWW.  However, EWW's counsel advised Employees' counsel that a ratification vote of Option 2 would be held on March 21, 2019, in compliance with the PLRB's Hearing Officer's Decision.  Based on that information, Employees filed the Renewed Motion for Preliminary Injunction on March 7, 2019, because,

---

[7] The initial Motion for Preliminary Injunction also sought an injunction against Union to preclude Union from taking any disciplinary action against Employees for filing the Complaint. However, Union eventually agreed not to take any such action against Employees and, therefore, this request became moot.

they averred, if EWW ratified those terms and conditions, Employees would be "permanently foreclose[d]" from obtaining the equitable relief they sought. (Renewed Motion for Preliminary Injunction ¶ 16, R.R. at 344a (emphasis omitted).) Therefore, Employees requested the trial court to either issue the injunction or hold a hearing prior to the Board's scheduled vote. Union Defendants filed a supplemental memorandum of law, in which they did not dispute that the Board was going to vote but argued that any alleged harm was either speculative or merely economic in nature. The trial court held a hearing on March 15, 2019, at which Union Defendants presented their evidence and Employees offered rebuttal.

## II. Trial Court Proceedings on Motion

### A. *Evidentiary Hearings*

The parties filed a Joint Stipulation with the trial court, in which they stipulated that EWW presented the "Final Offer" to Union's negotiating team on December 22, 2017. A copy of the "Final Offer" from the December 22, 2017 meeting, as well as a copy of what was presented to the bargaining unit members at the January 11, 2018 meeting, were attached as exhibits. The former reflected both Option 1 and Option 2; the latter reflected only the terms of Option 2. They further stipulated that Union Defendants presented only Option 2 to the bargaining unit members, who voted to approve that option. Employees offered the testimony of Mr. Kiddo and Ms. Clay, both bargaining unit members, as well as Aaron Stankiewiz, EWW's Human Resources Manager and member of EWW's negotiating team. They also presented affidavits of other bargaining unit members who supported the action and wanted a revote. Union Defendants presented the

9

testimony of Mr. Clark and documentary evidence, including correspondence with EWW's management regarding the Final Offer, and the PLRB Hearing Officer's Proposed Decision and EWW's exceptions thereto. Union Defendants questioned the trial court's jurisdiction given the decisions of the PLRB Hearing Officer and Chairperson Abelson, which they contended Employees were attempting to collaterally attack.

Relevantly, Mr. Kiddo testified consistently with the facts averred in the Complaint regarding the post-employment subsidy and its availability to EWW's other employees and his request that Local 2206's new CBA contain that benefit. For Mr. Kiddo, the post-retirement subsidy would likely result in his receiving an additional $25,000 to $28,000. Unlike prior negotiation teams, Mr. Kiddo explained, Union's negotiation team did not keep him or any other bargaining unit member informed of the negotiations. He further described the January 11, 2018 meeting as being "chaotic" when the topic of the post-employment subsidy came up. (Feb. 26, 2019 Hr'g Tr. at 33, R.R. at 378a.) Mr. Kiddo indicated that one or more union officials said that members would lose their pensions or may have to work nights and weekends if they pursued the post-employment subsidy, and another called him selfish for wanting that benefit. According to Mr. Kiddo, the bargaining unit members were never informed that EWW had presented two options in the Final Offer or that EWW was willing to agree to a post-employment subsidy. Mr. Kiddo testified that this information would have affected his vote because he would have voted for Option 1. He stated he voted against Option 2 because he believed Union Defendants could have done better, particularly because EWW had agreed to provide the post-employment subsidy to EWW's non-unionized administrative employees and those employees represented by the local

10

Teamsters.[8] Mr. Kiddo testified that, upon receiving the letter from EWW in February 2018, he and 12 other members contacted Union asking for a revote on the Final Offer as presented on December 22, 2017, a request that was denied. On cross-examination, Mr. Kiddo acknowledged that approving Option 1 would mean that employees hired after January 1, 2018, would not have the defined benefit pension plan, but instead would have a defined contribution retirement plan. This would result in those employees having different terms and conditions of employment than he has, but Mr. Kiddo stated that he had different terms and conditions than those who had worked longer for EWW than he had due to changes in the CBAs.

Ms. Clay, a member of the bargaining unit, testified that she, too, wanted the post-employment subsidy in the new CBA. She explained that Union did not update the bargaining unit regarding the negotiations and, when she asked a member of the negotiating team about the desired benefit, the team member would not discuss the ongoing talks. Ms. Clay testified that the way Option 2 was presented at the January 11, 2018 ratification meeting reflected that it was EWW's final offer and that if it was not accepted, worse offers would be forthcoming. According to Ms. Clay, the meeting was uncomfortable, others were frustrated, and she felt pressured to vote. When Mr. Kiddo asked about the post-employment subsidy, Ms. Clay became upset because she really wanted that benefit to be included in the new CBA. Ms. Clay, like Mr. Kiddo, testified that there was no mention that EWW had included two options in its Final Offer and that the other

---

[8] It also appears that the post-employment subsidy is a benefit that the City offers to some of its unionized employees. Mr. Kiddo testified that this benefit is in the **City's** CBA with Local 2206, which covers Mr. Procious. (R.R. at 443a.)

option included the post-employment subsidy. Had that information been provided to her, Ms. Clay indicated it would have affected her vote. She voted against Option 2 because she wanted Union to fight back and was distressed by what happened at the meeting. Ms. Clay explained that, upon learning of EWW's full Final Offer, she was surprised that both options were not presented at the meeting given that it did not require employees to work nights and weekends or for employees to forgo their retirement benefits. Ms. Clay joined in Mr. Kiddo's request for a revote.

Mr. Stankiewiz testified that he had negotiated multiple contracts for EWW and that EWW's Final Offer to Union included the two options. Upon learning that only Option 2 was presented to the bargaining unit for ratification, Mr. Stankiewiz explained that EWW's management chose not to present the agreement to EWW's Board because, if the Board voted to approve that option, it would be binding on EWW and the bargaining unit. Mr. Stankiewiz testified that he would receive the post-employment subsidy benefit, and that Union's and the City's CBA, which applies to Mr. Procious, as well as the CBA between EWW and its other unionized employees, include that benefit. He acknowledged that, during the negotiations, EWW proposed that employees work nights and weekends, but that was not in the Final Offer. In addition, Option 2, presented at the December 22, 2017 meeting, was the first time that EWW presented an offer that did not alter the existing pension plan. Mr. Stankiewiz testified about the difference between the two types of retirement plans at issue in Option 1 and Option 2, and that, under Option 1, a person hired after January 1, 2018, would not have the option to join the existing defined benefit pension plan.

12

On Union Defendants' behalf, Mr. Clark explained the relationship between District Council 85, of which he is the chief negotiator, and Local 2206, with the former being the sole bargaining agent for the latter. Mr. Clark described the process for negotiating CBAs, including that while employer proposals need not be presented to the bargaining unit for approval, tentative agreements should be presented, and if no tentative agreement can be reached, the employer's final offer will be presented. He testified that if the bargaining unit did not approve a tentative agreement or final offer, the negotiating team would meet with the employer again and renew negotiations.

Mr. Clark testified about his understanding of what a final offer is generally and of the Final Offer presented by EWW at the December 22, 2017 meeting. He explained "[a] final offer is generally when we've negotiated for quite some time and we are just locked up and can't move any further on anything and the employer has decided they're [sic] going to come forward with their [sic] last, best or final offer during negotiations." (March 15, 2019 Hr'g Tr. at 15, R.R. at 479a.) Mr. Clark explained the differences between Option 1 and Option 2, that the Final Offer was worded to allow Union to decide which option to present to the members, and that, after EWW presented the Final Offer at the December 22, 2017 meeting, the negotiating team caucused and decided that it would present only Option 2 to the bargaining unit because it preserved the defined benefit pension plan. The Final Offer presented to the negotiating team stated "the Union will select one of the following options to apply to all of its members." (R.R. at 642a.) Mr. Clark stated Union informed EWW it would be taking Option 2 to the membership and asked EWW to revise the offer so that only Option 2 was included. According to Mr. Clark, there was no objection at that meeting to their

13

only presenting one part of the Final Offer to the membership and, in fact, they shook hands on it. Mr. Clark indicated he subsequently received an email from EWW's chief negotiator with a reformatted offer that included both Option 1 and Option 2, and the email stated that EWW's Final Offer included both options and EWW was allowing the bargaining unit to decide which option to accept. Mr. Clark stated he was never confused about presenting only a part of the Final Offer and the only confusion in that regard was on EWW. Because the negotiating team did not agree that both options in the Final Offer had to be presented to the membership, Mr. Clark testified they presented Option 2 to the membership for approval on January 11, 2018.

Regarding the January 11, 2018 meeting, Mr. Clark explained that, because no tentative agreement had been reached, he advised the bargaining unit that he would stay at the meeting as long as needed to answer any questions and to make them comfortable to vote. He denied making any recommendations regarding which way they should vote and, when the post-employment subsidy was discussed, Mr. Kiddo became agitated about the benefit not being in the presented offer. Mr. Clark acknowledged that he raised his voice during the meeting, but denied making threats. Mr. Clark stated he advised the membership that the negotiating team chose not to pursue the post-retirement subsidy because it would have "done away with the defined benefit plan for new hires," a price they thought was too great for that benefit. (March 15, 2019 Hr'g Tr. at 29, R.R. at 493a.) Ultimately, 15 of 18 members present voted to approve Option 2, but, notwithstanding Union's ratification of that contract, Mr. Clark testified that EWW had not yet voted to approve or reject the contract. He acknowledged receiving the request for a revote on the Final Offer and explained that because EWW had not

14

approved the new contract, membership's wages have been frozen since December 21, 2017, although any increase would be retroactive.

Finally, Mr. Clark expressed his understanding of the AFSCME Constitution and what must be presented to bargaining unit members during the negotiation of a CBA. He explained that this document did not require the negotiating team to bring "proposals" that the team finds unacceptable to the bargaining unit. This interpretation, he asserted, was consistent with the interpretation found in the Abelson Decision. Mr. Clark agreed on cross-examination that he is required to be honest with and act in good faith and fairness toward the bargaining unit, and that he cannot defraud members, make misrepresentations regarding an employer's offers, and may not hide relevant and important information from members when they meet to vote on a contract. Mr. Clark indicated it would be inappropriate to present something that had not "been put on the table by the employer" or to present "whatever [the negotiating team] want[ed] to present" for voting. (*Id.* at 42, R.R. at 506a.) He acknowledged that Option 1 contained terms and conditions of employment that would be relevant to the bargaining unit's decision on approving or rejecting the offer presented to them. Mr. Clark testified that he owed a duty to all workers covered by the CBA, not only Union members, and observed that, even if the post-employment subsidy was included in this CBA, that did not guarantee it would be included in subsequent CBAs.

Mr. Kiddo testified in rebuttal. He stated the bargaining unit members' trust and confidence in Union to adequately protect their interests has been reduced after the negotiating team did not present all of EWW's Final Offer. However, he acknowledged that he was unsure if granting the injunction would remedy that harm. (*Id*. at 61-62, R.R. at 525a-26a.)

15

*B. Trial Court's Opinion and Order*

Following the hearings, the trial court issued its March 19, 2019 Order, granting the Motion and enjoining EWW from voting on and entering into a contract with Union until the Employees' action was resolved. In its subsequently filed opinion, the trial court explained its reasons for granting the Motion.

The trial court found Union Defendants' arguments that the trial court lacked jurisdiction based on the PLRB decision unavailing because individual claims by union members against their union for breach of the duty of fair representation do not fall within the PLRB's jurisdiction. (Trial Ct. Op. at 37-38 (citing *Case v. Hazelton [sic] Area Educ. Support Pers. Ass'n (PSEA/NEA)*, 928 A.2d 1154, 1161 (Pa. Cmwlth. 2007)).) The trial court then explained how Employees had established the six requirements for obtaining a preliminary injunction.[9] The trial

---

[9] A party seeking the preliminary injunction is required to show that:

(1) "an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages";

(2) "greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings";

(3) "a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct";

(4) "the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits";

(5) "the injunction it seeks is reasonably suited to abate the offending activity"; and

(6) "a preliminary injunction will not adversely affect the public interest."

**(Footnote continued on next page…)**

16

court concluded that Employees had established a clear right to relief and were likely to prevail on the merits, noting that they need not prove the merits of their case but only need to present substantial legal questions that would need to be resolved to determine the parties' rights. (*Id.* at 35.) The trial court explained that Employees presented evidence that "strongly suggest[ed]" that Union Defendants concealed information from and actively misled bargaining unit members at the January 11, 2018 meeting regarding the terms of EWW's Final Offer, presented an "altered" offer that was different from the Final Offer EWW had presented, and misled members regarding the potential consequences of their rejecting the offer presented at the meeting. (*Id.*) The trial court was unpersuaded by Union Defendants' arguments that there was no clear right to relief here due to the Abelson Decision because that decision did not address the claims that were before the trial court. (*Id.* at 37-38 (citing Abelson Decision at 4 n.1[10]).) The trial court also questioned the reasonableness of the Abelson Decision.

Second, the trial court held that Employees established that immediate and irreparable harm that could not be compensated by damages would occur if the

---

**(continued…)**
*Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995, 1001 (Pa. 2003).
[10] In footnote 1, Chairperson Abelson explained he would

> not be addressing the content of the offer(s) submitted by management, nor [would he] be addressing the merits of those offers or the correctness of the union's bargaining team in rejecting one of the options and agreeing to recommend the other option to the membership for ratification. The Judicial Panel will not insert itself into the collective bargaining process. The sole issue before [him] is whether the accused parties violated the [AFSCME] Constitution when it failed to bring the entire final offer (Option 1 and Option 2) to the membership for their vote.

(R.R. at 263a.)

17

preliminary injunction was not granted. It agreed with Employees that allowing EWW to ratify Option 2 "would, in effect, undermine the collective bargaining process, given the apparent breach of the duty of fair representation which led to the vote by union members in favor of" that contract. (*Id.* at 38.) Further, the trial court explained EWW's ratification would require Employees to work under the less favorable conditions and terms of Option 2 and would "foreclose [Employees] from seeking relief, including the opportunity to revote on the Final Offer." (*Id.*) The trial court rejected Union Defendants' arguments because it was unlikely EWW's Board would refuse to ratify Option 2 given that Union would likely bring an action under PERA for doing so, an undermining of the collective bargaining process would occur, and the members' continued loss of confidence in Union constituted non-economic damages.

Third, the trial court concluded Employees established that greater harm would result from refusing the injunction and that the other interested parties would not be substantially harmed because not enjoining EWW would result in the execution of a CBA that was the result of "inadequate representation." (*Id.* at 39.) In addition, not granting the preliminary injunction, the trial court held, would limit "the opportunity for full and fair discussion between union members and union representatives of [EWW's] Final Offer and for a meaningful vote on the entirety of [that] Final Offer." (*Id.*) Thus, the trial court explained, "[m]aintaining the status quo will not substantially harm other interested parties in the proceedings." (*Id.*)

On the final three requirements for obtaining a preliminary injunction, the trial court found that Employees met their burden of proof. The trial court held that preventing EWW from ratifying Option 2 properly restores the parties to the

status quo that existed prior to the alleged wrongful conduct because "[t]he parties will continue to work under the terms of an expired CBA which the parties have honored as controlling the terms of employment." (*Id.*) It also concluded that the preliminary injunction is reasonably suited to abate the offending activity by preventing EWW from ratifying Option 2 and allowing the parties to litigate their claims fully and for Employees to seek redress for the alleged violation of their right to fair representation. Finally, the trial court held the public interest would not be adversely affected by granting the preliminary injunction because there was no evidence of adverse impact on the public and enjoining EWW would promote the public interest by allowing Employees to resolve their claims, consistent with their right to fair representation.

Union Defendants appealed and, at the direction of the trial court, filed a Concise Statement of Errors Complained of on Appeal (Statement) pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), Pa.R.A.P. 1925(b). The trial court issued its Rule 1925(a) opinion indicating Union Defendants' appeal was without merit for the reasons set forth in its earlier opinion. The matter is now ready for this Court's consideration.

## III. Union Defendants' Appeal

### A. *General Legal Principles*

Before addressing the parties' arguments, we set forth the legal standards applicable to our review of the grant or denial of a preliminary injunction. An appellate court reviews an order granting or denying a preliminary injunction for

19

an abuse of discretion.[11]  *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995, 1000 (Pa. 2003).  Under this standard, the appellate court does not inquire into the controversy's merits but examines the record "to determine if there were any apparently reasonable grounds for the action of the court below." *Id.* (quoting *Roberts v. Bd. of Dirs. of Sch. Dist. of Scranton*, 341 A.2d 475, 478 (Pa. 1975)).  "Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the [trial court]." *Roberts*, 341 A.2d at 478.  The "apparently reasonable grounds" standard applies where a trial court has granted, as here, a prohibitory injunction.[12]  *City of Phila. v. Dist. Council 33, Am. Fed'n of State, Cty. & Mun. Emps., AFL-CIO*, 598 A.2d 256, 259 (Pa. 1991).

"A preliminary injunction is an extraordinary remedy." *Hart v. O'Malley*, 676 A.2d 222, 223 n.1 (Pa. 1996).  There are six "essential prerequisites" that a party seeking a preliminary injunction must establish in order for a court to issue the injunction.  *Summit Towne Centre, Inc.*, 828 A.2d at 1001 (internal quotation marks omitted).  If any are unmet, the injunction will not be granted.  *Id.*  As described by our Supreme Court, the party seeking the preliminary injunction is required to show that:

> (1) "an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages";

---

[11] An appellate court's "scope of review in preliminary injunction matters is plenary." *SEIU Healthcare Pa. v. Commonwealth*, 104 A.3d 495, 501 n.7 (Pa. 2014).

[12] A prohibitory injunction enjoins a person or entity from taking action that would change the status quo, but a mandatory injunction requires a person or entity to take positive action to preserve the status and is subject to stricter scrutiny.  *Mazzie v. Commonwealth*, 432 A.2d 985, 988 (Pa. 1981).

20

(2) "greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings";

(3) "a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct";

(4) "the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits";

(5) "the injunction it seeks is reasonably suited to abate the offending activity"; and

(6) "a preliminary injunction will not adversely affect the public interest."

*Id.*

*B. Parties' Arguments*

On appeal, Union Defendants argue the trial court abused its discretion in granting the Motion and issuing the preliminary injunction because there are no reasonable grounds to conclude Employees established any of the requirements for obtaining that relief. They contend that: Employees' alleged harm is speculative and can be remedied by monetary damages; greater injury will occur from the denial of the injunction because the members of the bargaining unit have been working under the terms and conditions of the Prior CBA, which has resulted in a wage freeze; and Employees are not likely to prevail on the merits because internal union affairs should be governed by the union and there is no obligation for Union Defendants to have acted in a different way under either PERA or the AFSCME Constitution. Union Defendants also assert the trial court's Order went beyond what was necessary to abate the offending activity by precluding EWW's Board from engaging in any additional collective bargaining. Further, they argue the

21

Order infringes upon the decisions of the PLRB's Hearing Officer and Chairperson Abelson, and Employees' collateral attack on those determinations should not be sanctioned as it alters the status quo and adversely affects the public's interest by undermining PERA and ensuring internal union governance.

The PLRB filed an amicus brief in favor of reversing the trial court's Order. The PLRB contends that the Order precludes the PLRB's ability to enforce the Hearing Officer's Decision and, more importantly, PERA, where EWW was found to have committed multiple unfair labor practices. This result, the PLRB asserts, adversely affects the public's interest and results in substantial harm to the interested parties and, therefore, the trial court's Order should be reversed.

Employees respond there was no abuse of discretion because reasonable grounds support the trial court's Order. They assert they will suffer immediate and irreparable harm because they have lost the meaningful ability to vote on Option 1, the collective bargaining process would be undermined, and their confidence in Union Defendants will be harmed if the injunction is overturned. Employees maintain greater injury will occur because they will have lost the ability to revote on EWW's whole Final Offer, neither Union nor EWW suffer any harm, and there will be no adverse effect on the public's interest. Employees contend the status quo was the situation prior to the January 2018 ratification meeting and allowing EWW's Board to vote on Option 2 would alter that status quo, which makes the trial court's Order reasonably suited to abate the offending activity. They further argue that they sufficiently demonstrated a clear right to relief because substantial legal questions exist as to whether there was a breach of the duty of fair representation and neither those questions, nor the trial court's authority to resolve

those questions, are affected by the determinations made by the PLRB's Hearing Officer or Chairperson Abelson.[13]

*C. Discussion*

Because Union Defendants assert that Employees did not satisfy any of the six prerequisites for obtaining a preliminary injunction, we begin our analysis with the first of those prerequisites: that the party seeking a preliminary injunction must establish that "an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages." *Id.* In reviewing this prerequisite, we are mindful that the alleged harm or consequences must not be speculative in nature and "speculative considerations . . . cannot form the basis for issuing [a preliminary injunction]." *Novak v. Commonwealth*, 523 A.2d 318, 320 (Pa. 1987) (citation omitted).

Union Defendants argue that Employees had to show by "concrete evidence" that they would suffer immediate and irreparable harm that was not speculative and not economic in nature. (Union Defendants' Brief (Br.) at 43 (quoting *Summit Towne Centre, Inc.*, 828 A.2d at 1003).) They maintain that a review of the evidence reveals that there were no reasonable grounds for the trial court to have found that Employees' alleged harm met this standard. Instead, Union Defendants assert, Employees' arguments presume that the Board would approve Option 2 and that, if they prevail in their action and obtain the right for a revote, the membership would ratify Option 1, both of which are speculative in nature. According to Union Defendants, the trial court's conclusion that EWW would ratify Option 2, resulting in immediate and irreparable harm, is not

---

[13] EWW has not filed a brief in this matter.

supported by the record. Further, they argue, there is no evidence as to why Employees would be irreparably harmed if the revote requested in the Complaint was delayed, citing *Smith v. Bowers*, 337 F. Supp. 2d 576, 592 (S.D.N.Y. 2004), or that Employees would suffer anything more than economic harm that could be compensated with damages. Finally, to the extent Employees relied on their alleged loss of confidence in Union to adequately represent them, Union Defendants argue that Mr. Kiddo acknowledged that he did not know if the grant of the injunction would restore his trust in Union. (Union Defendants' Br. at 48-49 (citing R.R. at 524a-26a).)

Employees respond that immediate and irreparable harm will occur if EWW ratifies Option 2 because it will change the terms of a CBA without bargaining unit support and will undermine the collective bargaining process. *Dist. Council 33*, 598 A.2d at 260. Employees also argue the injunction was proper to stop the ratification of Option 2, which was the result of that unlawful conduct, namely presenting only part of EWW's Final Offer, despite knowing EWW intended both options to be presented. *See Pa. Gaming Control Bd. v. City Council of Phila.*, 928 A.2d 1255, 1258 (Pa. 2007) (enjoining the inclusion of a ballot question that would essentially prohibit locating licensed gaming facilities within particular areas of the City of Philadelphia as being unlawful because the city and the voters could not interfere with the Pennsylvania Gaming Control Board's (Board) sole authority over the licensing and locating of gaming facilities); *Hempfield Sch. Dist. v. Election Bd. of Lancaster Cty.*, 574 A.2d 1190, 1193 (Pa. Cmwlth. 1990) (enjoining the local election board's inclusion of a nonbinding referendum on the school district's decision to construct a new high school as being per se immediate irreparable harm where the election board lacked the authority to authorize the

referendum). Employees assert these cases stand for the proposition that where "the threatened harm is a vote procured through unlawful conduct, then an injunction is proper to prevent the vote from taking place." (Employees' Br. at 17). These actions have resulted in the loss of confidence in Union and have "upset the 'peaceful labor of union members,' [a] harm [that is] not compensable by damages." (Employees' Br. at 19 (quoting Trial Ct. Op. at 39).) Further, allowing the Board to vote on Option 2, Employees contend, "foreclose[s] Employees' ability to revote on EWW's Final Offer and forever alter[s] the parties' posture." (*Id.*) All of these harms, Employees contend, are non-economic and cannot be compensated by monetary damages.

In their reply brief, Union Defendants argue the cases Employees cite are distinguishable. In *Hempfield School District*, the injunction was properly granted because there was no legal authority for the local election board to include a nonbinding referendum on the ballot. *Pennsylvania Gaming Control Board* is inapplicable, Union Defendants argue, because the proposed ordinance that would allow Philadelphia's electorate to usurp the Gaming Control Board's statutory authority to locate licensed facilities within the city was unlawful and, therefore, the injunction preventing the ordinance from being voted upon was properly granted. In contrast to these cases, Union Defendants maintain, there can be no question regarding the Board's authority under PERA to vote on Option 2, in accordance with the Hearing Officer's Decision, as the Board is EWW's governing body, authorized to enter into contracts on EWW's behalf. Union Defendants argue *District Council 33* does not support Employees' claim of immediate and irreparable harm because, in that case, the public employer was preliminarily enjoined from enacting an ordinance that would have unilaterally reduced the

25

union members' pension benefits, and no such unilateral action occurred here. In fact, they maintain, *District Council 33* actually supports the reasonableness of Union Defendants' rejection of Option 1 because, like the ordinance in *District Council 33*, that option would have diminished the retirement benefits of part of the bargaining unit.

In considering the parties' arguments on whether this requirement was satisfied, we remain cognizant that a preliminary injunction is an "extraordinary remedy," *Hart*, 676 A.2d at 223 n.1, that Employees had to demonstrate, through "concrete evidence," that the "injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages," *Summit Towne Centre, Inc.*, 828 A.2d at 1001-02, and that the harm is not speculative in nature, *Novak*, 523 A.2d at 320. Employees have argued, and the trial court found, that Employees would be forced to work under less favorable employment terms as to wages and benefits if the Board is not enjoined from ratifying Option 2 pursuant to the Hearing Officer's Decision. Our review, however, reveals that these alleged harms are speculative and/or economic in nature and, therefore, are insufficient to support the grant of the Motion.

First, there is **nothing** in the Hearing Officer's Decision that **requires** the Board to **approve** Option 2, only that it **vote** on Option 2. Employees **speculate** that the Board will ratify Option 2, rather than reject that option and return to the bargaining table, as the basis of all of their alleged harms. But "[s]peculative considerations . . . cannot form the basis for issuing a [preliminary injunction]." *Novak*, 523 A.2d at 320 (first alteration added); *Reed v. Harrisburg City Council*, 927 A.2d 698, 704 (Pa. Cmwlth. 2007). The standard for obtaining a preliminary injunction requires there to be "actual proof of irreparable harm," not speculation

26

or conjecture as to a potentially adverse result. *Reed*, 927 A.2d at 706 (emphasis omitted). "Speculative" can be defined as "theoretical," and "conjecture" as "the formation or expression of a[] . . . theory without sufficient evidence for proof" or a "guess."[14] For example, claims that something **may** happen in the future if the injunctive relief is denied is speculative and insufficient to support the grant of a preliminary injunction. *See Yarmoski v. Lloyd*, 531 A.2d 1169, 1171-72 (Pa. Cmwlth. 1987) (holding that the alleged harm, the potential that the petitioner "**may** be sued . . . at some future point" if the preliminary injunction was denied, was speculative and could not be considered immediate and irreparable harm) (emphasis added). Like the petitioner's allegations in *Yarmoski*, Employees' allegations of immediate and irreparable harm are based on what **may** happen when EWW's Board votes on whether to ratify Option 2, which the Board is **not required to ratify** by the Hearing Officer's Decision. Thus, the premise of Employees' arguments, the ratification of Option 2, is theoretical, making it a speculative consideration that should not be the basis for granting a preliminary injunction. *Novak*, 523 A.2d at 320.

Second, to the extent Employees assert that Option 2's benefits and wages are less favorable than those in Option 1, such harm is economic in nature and can be remedied by damages.[15] Although Employees maintain they will be required to work under less favorable conditions if Option 2 is ratified, the bargaining unit has been working under the terms and conditions set forth in the Prior CBA. Option 2 includes an **increase** in wages, which while less than those available in Option 1, is

---

[14] *See* https://www.dictionary.com/browse/speculative#, and https://www.dictionary.com/browse/conjecture# (last visited July 31, 2020).

[15] Under either Option 1 or Option 2, the bargaining unit members will be entitled to the increase in their wages retroactively.

more than what the bargaining unit is receiving under the Prior CBA. More importantly, the pertinent differences between Option 1 and Option 2 is the **different level of wage increases** over the term of the CBA and the **availability of the post-employment subsidy**, both of which are monetary in nature and can be remedied through the payment of damages should Employees prevail on their Complaint. Similarly, ratification of Option 2, which maintains the defined benefit pension plan, results in no change to the bargaining unit members' pensions, including those who were hired after January 2018, while Employees' litigation is pending and is similar to the Prior CBA under which they have been working.

In sum, Employees' arguments in these regards are insufficient because they are based on speculation and/or economic harms that can be remedied by damages. This is particularly evident because the parties have agreed that **if** Employees are successful in their action, and **if** the bargaining unit, a majority of which have not joined Employees in this litigation, votes for Option 1 instead of Option 2, and **if** EWW ratifies Option 1, the relevant terms of Option 1, with the exception of the change in retirement plan for the employees who were hired after the expiration of the Prior CBA and prior to the ratification of Option 1, can be applied **retroactively**. Thus, the alleged harms cited above do not support the conclusion that non-speculative, irreparable, immediate harm that cannot be remedied by damages would occur if the injunction was denied.

We now turn to the two non-economic harms alleged. The first, that Employees' confidence in Union Defendants has been diminished, thereby undermining, in Employees' view, the collective bargaining process, is not persuasive since Mr. Kiddo acknowledged that granting the injunction was not likely to remedy this harm. (March 15, 2019 Hr'g Tr. at 61-62, R.R. at 525a-26a.)

28

The second is Employees' assertion, which the trial court found persuasive, that allowing the Board to ratify Option 2 would preclude a future vote on the complete Final Offer should Employees prevail. However, Employees did not present any "concrete evidence," *Summit Towne Centre*, 828 A.2d at 1002, indicating how or why the Board's ratification of Option 2, which is not required by the Hearing Officer's Decision, would preclude the bargaining unit members from voting on a complete Final Offer if Employees are successful in their action. Thus, they did not establish the requisite level of harm that warrants the grant of the extraordinary relief of a preliminary injunction.

Further, the appropriate remedy for a breach of the duty of fair representation varies depending on the nature of the particular breach. *Vaca v. Sipes*, 386 U.S. 171, 195 (1967). In *Smith*, the union members who filed the breach of the duty of fair representation claim sought, like Employees do here, a revote on the agreement and a preliminary injunction to stop the implementation of the collective bargaining agreement. 337 F. Supp. 2d at 579. The preliminary injunction was denied, allowing the agreement to go into effect and the court, in denying the preliminary injunction, noted the union members had not established that irreparable harm would result in delaying the revote and implementation of the agreement because, although the ultimate remedy might be more complex to implement should they prevail, it could be done. *Id*. at 592. Here, although Employees may question how the remedy could be implemented if Option 2 is ratified, they prevail, and Option 1 is subsequently ratified, the fact that implementing any remedy would be challenging or more complex if the preliminary injunction is denied does not mean there is irreparable, immediate harm. *Id*. Further, as discussed above, the harms caused by allowing EWW's

Board to vote on and **potentially** ratify Option 2 now, rather than waiting for the resolution of this litigation which **may** result in the ratification of Option 1, are economic and can be remedied by damages. Thus, these reasons also support the conclusion that non-speculative, irreparable, immediate harm that cannot be remedied by damages would not result if the injunction was denied.

Finally, Employees argue that *Pennsylvania Gaming Control Board*, *Hempfield School District*, and *District 33* support the conclusion that immediate and irreparable harm will occur if EWW's Board was to ratify Option 2, but such arguments are misplaced. In *Pennsylvania Gaming Control Board*, the Gaming Control Board (Board) sought a preliminary injunction to prevent the City of Philadelphia (Philadelphia) from submitting a ballot question asking whether the home rule charter should be amended to prohibit the location and licensing of gaming facilities in certain places after the Gaming Board had approved two slot machine licenses in Philadelphia. The Supreme Court granted injunctive relief, rejecting Philadelphia's argument that the injunction would be merely advisory as no vote had taken place, holding that the vote itself was unlawful because Philadelphia, and its voters, had no right to even consider the location of a licensed gaming facility because such issue remained within the Gaming Board's sole authority. *Pa. Gaming Control Bd.*, 928 A.2d at 1265. In *Hempfield School District*, a school district sought to enjoin a county election board from including a nonbinding referendum on a ballot asking if the voters agreed with the school district's plan to construct a new high school on the basis that the election board's actions were unlawful. This Court, on appeal from the denial of the injunction, reversed because the election board lacked any legal authority to place the referendum on the ballot. *Hempfield Sch. Dist.*, 574 A.2d at 1192-93. The actions

30

of the election board which were an unlawful attempt to infringe upon the school district's board of directors' authority, we held, constituted per se immediate and irreparable harm. *Id.* at 1193. Unlike in *Pennsylvania Gaming Control Board* and *Hempfield School District*, the Board is not exceeding its authority were it to ratify Option 2 on EWW's behalf. In fact, the Board's authority to act for EWW is unquestioned. Therefore, the bases for the grant of injunctive relief in those cases is not present here.

We also agree with Union Defendants that *District Council 33* provides little guidance to the circumstances here. In that case, the union sought a preliminary injunction to preclude Philadelphia's enforcement of a city ordinance that unilaterally changed the pension plan for Philadelphia's employees, including union members, by reducing the pension benefit and making it more difficult to become eligible for a pension. 598 A.2d at 257-58. After the court of common pleas granted the preliminary injunction and this Court affirmed, Philadelphia appealed to the Supreme Court. That Court, too, affirmed, citing the evidence that unilateral enforcement of the ordinance "would result in an immediate diminution of benefits to [union] members," which would have affected the union's membership because no one "would have any use for a union powerless to enforce its current collective bargaining unit." *Id.* at 260. *District Council 33* does not require a different result here. That matter involved an **employer's unilateral change** to the bargaining unit members' pension plans, not a challenge to a union's actions during the ratification process. Further, the union there established that irreparable harm, the unilateral change of the bargaining unit members' pension plans and corresponding negative consequences to the union's membership, would occur absent the grant of the preliminary injunction. In contrast, the vote by

31

EWW's Board on ratifying Option 2, whether it is approved or rejected, will not change the bargaining unit's pension plans because it was only Option 1 that involved a change to those plans or affected Union's membership, and Employees have not established non-speculative, immediate and irreparable harm that cannot be remedied by monetary damages will occur in the absence of the preliminary injunction.

Under these particular circumstances and for the above reasons, there do not appear to be reasonable grounds upon which the trial court could rely to find that Employees established that they would suffer non-speculative, immediate and irreparable harm that could not be compensated by damages. Should Employees prevail in their duty of fair representation case, there is no indication that they cannot be put in the situation they would have been had EWW not voted on Option 2. Indeed, if Option 2 is ratified, even if it is ultimately set aside in favor of Option 1, the current bargaining unit members will obtain the benefit of the salary increases set forth in Option 2 and new employees will continue to be enrolled in the defined pension plan until Option 1 is ratified, if that occurs. Thus, the trial court abused its discretion in holding that Employees satisfied this requirement, and, because all of the requirements must be established in order to obtain a preliminary injunction, they did not meet their burden of proving their entitlement to that relief.[16]

---

[16] Because of our disposition, it is not necessary to address whether Employees satisfied any of the other requirements.

## IV.    Conclusion

Because we conclude there are not reasonable grounds in the record to support the conclusion that Employees would suffer from irreparable, immediate harm that was not speculative and could not be remedied by damages, the trial court abused its discretion in granting the Motion.  Accordingly, we reverse.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mark Kiddo, Joan Hordusky,     :
Mike Dzurko, Christine Arnone,     :
Jennie Clay, Madelyn Groover,     :
Melissa Guzowski and Jeff Granger     :
    :
       v.     :   No. 468 C.D. 2019
    :
American Federation of State, County     :
and Municipal Employees, Local 2206;     :
American Federation of State, County     :
and Municipal Employees, District     :
Council 85; Randy Procious in his     :
official Capacity; Shane Clark in his     :
official Capacity; and Erie Water Works     :
    :
Appeal of: American Federation of     :
State, County and Municipal Employees, :
Local 2206; American Federation of     :
State, County and Municipal Employees, :
District Council 85; Randy Procious; and :
Shane Clark     :

# O R D E R

**NOW**, August 3, 2020, the Order of the Court of Common Pleas of Erie County, entered in the above-captioned matter, is **REVERSED**.

 

                               _____
                               **RENÉE COHN JUBELIRER,** Judge